**In re John E. ANDERSON, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 00–BG–230.

District of Columbia Court of Appeals.

Argued April 11, 2001.

Decided Aug. 2, 2001.

---

Abraham C. Blitzer, Washington, DC, for respondent.

Traci M. Tait, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief and supplemental brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before FARRELL, GLICKMAN, and WASHINGTON, Associate Judges.

FARRELL, Associate Judge:

The Board on Professional Responsibility (the Board) has recommended that respondent be suspended from practicing law in the District of Columbia for six months. The proposed discipline stems from findings by a Hearing Committee, accepted by the Board, that respondent had violated three Rules of Professional Conduct: Rule 1.15(a) (commingling and misappropriation); Rule 1.15(b) (failure to notify and deliver funds to third-party claimant); and Rule 1.17(a) (failure to designate trust or escrow account). Contrary to the determination of the Hearing Committee, however, the Board concluded that respondent's misappropriation of client funds had not been either intentional or reckless, and it therefore rejected the Committee's recommendation of disbarment, see In re Addams, 579 A.2d 190 (D.C.1990) (en banc), instead proposing his suspension for six months.

■ Because the Board's report and the initial briefs filed with the court reflected some uncertainty about the governing legal principles, we requested supplemental briefs addressing, among other things, which party bears the burden of proof on whether misappropriation of funds by an attorney carried with it sufficient features of culpability to justify the presumptive sanction of disbarment imposed by Addams. We remove any uncertainty in the answer our precedents give to that question and hold that the burden of proving misappropriation "result[ing] from more than simple negligence," Addams, 579 A.2d at 191, remains always with Bar Counsel. We then identify the kinds of aggravating circumstances that have caused the Board and this court to find intentional or reckless—rather than negligent—misappropriation in particular cases, and we conclude by explaining why we agree with the Board that respondent's unauthorized use of entrusted funds did not rise to that level and thus properly warrants suspension rather than disbarment.

I.

Respondent (hereafter Anderson) became a member of the District of Columbia Bar in 1989 and worked as an associate at a law firm doing personal injury work. Thereafter, he opened his own practice, sharing office space with another attorney who was not a member of the D.C. Bar. In the spring of 1991, Mark Calligan hired Anderson to represent him in a personal injury matter arising from an automobile accident. From March 5 through April 12 of 1991, Calligan received medical treatment from the practice of Drs. Phillips & Green for injuries suffered in the accident. Up until March 1992, Phillips & Green made repeated telephone calls to Calligan and some to Anderson about the unpaid status of bills for the treatment. Eventually a collection agency became involved,

and Calligan received regular calls from it regarding the bill. In turn, he repeatedly called Anderson and occasionally left messages at his door about the matter.

In March 1993, Anderson settled the personal injury claim for $6,500. On or about March 15, he deposited the settlement check into a checking account at Signet Bank, N.A., which was the only account he used in his practice. On March 24, 1993, Anderson presented Calligan with a settlement disbursement sheet reflecting that Anderson would receive $2,166.33 for his legal fee; $1,207.50 would be remitted to Phillips & Green for the outstanding medical bills; and Calligan would receive the balance (after deducting minor expenses) of $3,100. Although Anderson immediately paid Calligan his share, he made no payment to Phillips & Green at that time.

On or about April 2, 1993, the balance in Anderson's checking account fell below the $1207.50 due the medical provider; it remained there for about a month. Twice more, in February and April of 1994, the balanced dipped below the obligated amount for appreciable periods. In April of 1994, Anderson contacted Phillips & Green about an unrelated matter and was told of the outstanding bill in the Calligan case, whereupon he paid the medical providers the $1207.50.

Testifying before the Hearing Committee, Anderson asserted that he had simply forgotten to make the payment to Phillips & Green following settlement. He explained that at the same time the Calligan matter was settled, he was concluding a settlement in another personal injury case for a client named James Green. On the same day he gave Calligan the settlement sheet showing intended disbursements, he purchased a cashier's check payable to James Green for $3,700, and the following week purchased a cashier's check for

$1,090 to pay Green's medical provider, Dr. Wyatt. Having made these payments, he mistakenly believed—until informed otherwise thirteen months later—that he had also paid Drs. Phillips & Green.

Using cashier's checks in the above manner was part of the "system" Anderson followed generally to keep track of client funds and disbursements. As the Board recognized, this system had obvious pitfalls because "it did not permit [Anderson] to verify that he had written every check required for each client's settlement, a defect that proved to be especially problematic when two cases were settled at the same time." Specifically, although Anderson prepared settlement sheets listing required distributions for each case that resulted in a settlement, and made corresponding notations on the case file, he kept no separate trust or escrow account nor ledgers or books reflecting receipts and disbursements. He explained that, since he had relatively few clients, once he received a settlement check he would deposit it and then "immediately get [the] checks together [of everybody who was owed some money] and send them out," keeping record of these transactions "in [his] head."

Calligan testified that after the March 1993 settlement and receipt of his share, he received additional telephone calls from the collection agency telling him that the medical bill had not been paid. Between one and two months after the settlement he spoke with Phillips & Green and was told "the bill had been discharged." In the meantime, he left messages on Anderson's answering machine but could not remember whether in them he had said "anything more than please call me," rather than (or in addition to) giving the reason for the call. He was positive, however, that he had never spoken with Anderson after settlement about the unpaid medical bill.

The Hearing Committee found that Anderson had committed commingling and misappropriation (Rule 1.15(a)), and had failed both to notify and pay third-party claimants (Rule 1.15(b)) and to designate a trust or escrow account (Rule 1.17(a)). In concluding that the misappropriation resulted from recklessness and not simple negligence, it rejected Anderson's defense that the failure to pay the medical bill was inadvertent. First, the Committee reasoned, his "mere explanation ... that he 'forgot' to pay the medical providers" was not "sufficient to establish 'simple negligence' under applicable precedents"; rather, his "failure to maintain any system of documentary record-keeping constitutes recklessness, which in this context stands on the same footing as knowing and intentional misappropriation." Second, and "more importantly," the Committee "d[id] not credit [Anderson's] explanation of events as resulting from an honest, good faith lapse in memory." Rather, it found that his "self-serving testimony on inadvertence and regret are not credible given the time taken to pay the medical providers and the failure to respond to Mr. Calligan's payment status inquiries."

Before the Board, Anderson excepted only to the determination of recklessness and hence the recommendation for disbarment. The Board agreed with the Committee that he had violated all three ethical rules, but rejected the Committee's conclusion that the misappropriation was reckless. After analyzing this court's decisions at length, the Board concluded that they do not permit a conclusion that "the lack of any system of documentary bookkeeping," without additional circumstances in aggravation, supports a determination that misappropriation stemmed from recklessness. And, in the Board's view, the kinds of aggravating circumstances that support such a finding were absent in this case. Second, although acknowledging its duty to defer to the Hearing Committee on questions of credibility, the Board rejected as flawed the Committee's finding that Anderson's claim of inadvertence was not credible. That finding, it said, was "explicitly predicated ... upon [the Committee's] conclusion that [Anderson] had failed to respond to Calligan's payment status inquiries over an extended period of time," a finding that lacked substantial support because no clear and convincing evidence contradicted Anderson's testimony "that no one reminded him about the outstanding medical provider bill after the settlement check was received." The Board therefore found no record basis for rejecting his explanation that he had been confused and simply forgotten to make the medical payment. Since, under this court's precedents, the Board considered Anderson's misappropriation to have resulted only from negligence, it recommended his suspension for six months.

## II.

Anderson does not dispute, and the Board and Bar Counsel are in agreement, that he engaged in commingling, failure to maintain funds in a trust account, and failure to make prompt payment of funds owed to a third party. Anderson also does not dispute the Board's conclusion that he misappropriated funds that he was required to pay on Calligan's behalf when the balance in his operating account fell (repeatedly) beneath the amount needed to pay the medical bills. *See, e.g., In re Micheel,* 610 A.2d 231, 233 (D.C.1992) (citations omitted). Finally, Anderson accepts the Board's recommendation of a six month suspension. Bar Counsel, on the other hand, takes strong exception to the Board's rejection of the Committee's determination of recklessness. At the very outset, moreover, it disagrees with the Board's allocation of the burden of proof

on the issue of whether misappropriation has been intentional or reckless so as to require disbarment, as a presumptive matter, under *Addams*. We therefore begin our discussion by setting forth the relevant legal principles, including the burden of proof, and then assess the Board's recommendation in light of them.

## A. Principles

### 1. Burden of Proof

■■■ Our disciplinary cases define misappropriation as "any unauthorized use of client's funds entrusted to [the lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983) (citation and quotation marks omitted). Bar Counsel must prove unauthorized use of client funds by clear and convincing evidence, *see, e.g., In re Gilchrist*, 488 A.2d 1354, 1357 (D.C.1985), in keeping with the general rule that "[t]he burden of proving the [disciplinary] charges rests with Bar Counsel[,] and factual findings must be supported by clear and convincing evidence." *In re Williams*, 464 A.2d 115, 119 (D.C.1983); *see also In re Mitchell*, 727 A.2d 308, 313 (D.C.1999) ("It is Bar Counsel's burden to establish by clear and convincing evidence that respondent violated the Rules of Professional conduct."). In the case of misappropriation, however, that proof requirement is not a demanding one, because misappropriation occurs whenever

> the balance in [the attorney's operating] account falls below the amount due to the client. Misappropriation in such situations is essentially a per se offense; proof of improper intent is not required.

*Micheel*, 610 A.2d at 233 (citations omitted).

In *Addams*, this court sat en banc to consider the proper sanction for misappropriation. Before us was the case of an attorney whose actions constituting misappropriation "were not the result of simple negligence but were, as he admit[ted], intentional." 579 A.2d at 199. Because we were satisfied that "[t]he Bar of the District of Columbia has had sufficient notice of the gravity with which the court views intentional misappropriation," *id.* at 198, we "reaffirmed that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *Id.* at 191. While not adopting "a per se rule," we "adhere[d] to the presumption [of disbarment] laid down in our prior decisions" regarding non-negligent misappropriation, and held that we would "regard a lesser sanction as appropriate only in extraordinary circumstances." *Id.*[1]

Bar Counsel, relying principally on *Addams*, contends that once misappropriation has been proved, the burden shifts to the attorney to persuade the Board and the court that the misconduct has "resulted from nothing more than simple negligence." Bar Counsel derives her position from the way we phrased the presumption of disbarment in *Addams* ("disbarment will be the … sanction *unless* it appears …"), as well as from her conviction that placing the burden to prove more than negligence on Bar Counsel would effectively create a "presumption" the other way— *i.e.*, of negligent or inadvertent misappropriation—thereby "vitiat[ing] the … purpose of the strict sanction announced in

---

1. As an example of such circumstances, we cited *In re Kersey*, 520 A.2d 321 (D.C.1987), which had held that alcohol dependency may constitute a mitigating factor in discipline cases sufficient to avoid the sanction of disbarment.

*Addams* " (Supp. Br. for Bar Counsel at 8). The Board disagrees. It contends that a rule of presumptive disbarment upon proof by Bar Counsel of an essentially *per se* offense, placing upon the attorney the burden to prove the lesser degree of culpability necessary to avoid that sanction, would be excessive and, equally important, inconsistent with our decisions, chiefly *In re Thompson*, 579 A.2d 218 (D.C.1990). We think the Board has the better of the argument.

■ As pointed out, the issue before the court in *Addams* was "the appropriate sanction for Addams' intentional misappropriation of client funds." 579 A.2d at 192. Before and since *Addams*, however, our decisions have made clear that misappropriation "resulting from more than simple negligence" need not be intentional or purposeful to warrant disbarment. Rather, as the Board aptly formulates the standard, disbarment will be presumptively required if the attorney's conduct demonstrated an unacceptable level of disregard for the safety and welfare of entrusted funds, *see, e.g., Micheel*, 610 A.2d at 236, a showing the Board and the court have consistently summed up in the term "reckless." We discuss that standard further in part II. A.2., *infra*. For present purposes, however, the important fact about *Addams* is that the attorney's state of mind or level of culpability was not at issue there—he admitted intentionality—and the court thus had no occasion to consider who had the burden of proving more than ordinary negligence. In another case, *Thompson*, decided shortly after *Addams*, the court was effectively confronted with that issue when asked to decide whether Bar Counsel's general obligation to prove disciplinary violations should be qualified to take account of the special difficulties of proof in misappropriation cases.

In *Thompson*, Bar Counsel had charged the attorney with "dishonest misappropriation of a client's funds" in violation of then-DR 1–102(A)(4) (dishonesty) and DR 9–103(A) (commingling and misappropriation). *Thompson*, 579 A.2d at 218, 220. The Board, although acknowledging Bar Counsel's burden to prove both dishonesty and misappropriation by clear and convincing evidence, had sought to overcome the extreme difficulty Bar Counsel sometimes faces in tracing funds from one attorney account to another when investigating possible unauthorized use of entrusted funds. The Board had therefore adopted and applied in *Thompson* a rule that

> whenever a lawyer takes his clients' funds for any non-*de minimis* period of time without authorization and without any proper accounting for them, the law creates a rebuttable presumption that the lawyer has dishonestly misappropriated those funds, whereupon the burden of going forward with explanatory evidence shifts to the lawyer.

*Id.* at 221 (quoting Board Opinion). In this court, Thompson challenged that rule as effectively shifting the burden to him to prove that he had not acted dishonestly.

The court recognized that the Board had been careful to leave the burden of persuasion by clear and convincing evidence with Bar Counsel, *id.*, but it was nonetheless concerned that, "[i]n these circumstances, a shift in the burden of explanation may blend imperceptibly with a shift in the burden of proof." *Id.* at 223. The court therefore concluded "that it is neither necessary nor advisable to invoke a formal rebuttable presumption whenever Bar Counsel has proven an unauthorized taking of client funds for a non-de minimis period and without a proper accounting." *Id.* at 221. It held instead

> that the Board may weigh, together with all of the other evidence, an attorney's

explanation for—or conversely inability to explain satisfactorily—the use of a client's funds in deciding whether Bar Counsel has met its burden of proving dishonest misappropriation by clear and convincing evidence.

*Id.* It reiterated that "Bar Counsel may properly offer the inadequacy (or non-existence) of the attorney's explanation for the use of client funds as one significant—and even decisive—factor in proving dishonest misappropriation," *id.* at 222, but it limited the significance of that explanation "to circumstantial evidence which the Board may consider, along with all the other evidence, in determining whether Bar Counsel has proven dishonesty by clear and convincing evidence." *Id.* at 223.

█ When misappropriation is alleged separately to have also constituted "dishonesty," accordingly, *Thompson* makes clear that Bar Counsel retains the burden of proving that the misappropriation was of such character as to require presumptive disbarment under *Addams.* That is true even though the respondent's explanation for the misconduct may be considered by the factfinder along with the other evidence in assessing the sufficiency of Bar Counsel's case. But what if Bar Counsel does not charge the misappropriation separately as an act of dishonesty? The Board informs us that since the decision in *Addams,* Bar Counsel's practice has changed and that in contrast to the former practice exemplified by *Thompson* of charging dishonesty for (and along with) misappropriation, Bar Counsel now regularly charges

intentional or reckless misappropriation as a violation of Rule 1.15(a) only (the successor to DR 9–103(A) (misappropriation)), alleging dishonesty (Rule 8.4(c)) only when there has been separate though related conduct of that description.[2] We agree with the Board, nonetheless, that the fact that misappropriation is not alleged to have been dishonest—but rather intentional or reckless—should not mean a reallocation of the burden of proof. The *Addams* sanction of near-automatic disbarment for misappropriation resulting from more than negligence is a strict one; it should not be triggered, in our judgment, solely by proof by Bar Counsel—even by clear and convincing evidence—that the attorney let the funds in his operating account drop below the obligated level, leaving it to him to prove that he lacked the requisite intent or level of culpability.

*Addams* itself does not imply the contrary. There we were careful to state that "disbarment would be the usual sanction for misappropriation *not involving simple negligence,*" 579 A.2d at 196 (emphasis added), and that once that level of misconduct is established the inquiry turns to whether "mitigating factors" have been shown "sufficient to *rebut* the presumption" of disbarment. *Id.* at 199 (emphasis added). The clear implication is that the attorney's obligation to "rebut" arises only when non-negligent misappropriation has been demonstrated by Bar Counsel. *In Pels,* we read *Addams* as having "placed upon the attorney the burden of proving 'extraordinary circumstances' that justify

---

**2.** *Compare, e.g., In re Godfrey,* 583 A.2d 692, 693 n. 1 (D.C.1990) (dishonest misappropriation in violation of DR 9–103(A) and DR 1–102(A)(4)); *In re Hines,* 482 A.2d 378, 380 (D.C.1984) (reckless misappropriation in violation of DR 9 103(A) and dishonesty in violation of DR 1–102(A)(4)); *Thompson, supra,* with *In re Utley,* 698 A.2d 446 (D.C.1997) (reckless misappropriation); *In re Stanback,* 681 A.2d 1109 (D.C.1996); *In re Pels,* 653 A.2d 388 (D.C.1995); *In re Lenoir,* 585 A.2d 771, 784 (D.C.1991). *See also In re Johnson–Ford,* 746 A.2d 308 (D.C.2000) (besides misappropriation, dishonesty violation charged based on forgery of client signatures on money orders); *In re Carlson,* 745 A.2d 257 (D.C. 2000) (dishonesty violation based on false assurance to client that insurer would be paid).

departure from the presumptive rule of disbarment," 653 A.2d at 389 (quoting *Addams*, 579 A.2d at 191), but the reference to *Kersey*-equivalent "extraordinary circumstances" (see note 1, *supra* ) clearly indicated our understanding that the attorney must prove that the presumed sanction of disbarment is inappropriate for his particular case of *intentional or reckless* misappropriation. *See also id.* at 397–98. Despite ambiguous language in some of our decisions,[3] we are convinced that our law places the burden of proving the requisite level of culpability on Bar Counsel. As was stated in *In re Ray*, 675 A.2d 1381, 1388 (D.C.1996), "If [the attorney's] conduct was not deliberate or reckless, then Bar Counsel proved no more than simple negligence."

### 2. Recklessness

■ We pointed out earlier that misappropriation "resulting from more than simple negligence," hence subject to *Addams* disbarment, does not require proof that the attorney acted intentionally or deliberately. Although the question of sanction under *Addams* has sometimes been posed as whether the misappropriation was "intentional or [instead] negligent," *see, e.g., In re Berryman*, 764 A.2d 760, 768 (D.C. 2000), we have consistently recognized that misappropriation revealing an unacceptable disregard for the safety and welfare of entrusted funds—in short, that is reck-

less—will warrant disbarment under *Addams*.[4] The hallmarks of such misconduct revealed by our cases include: the indiscriminate commingling of entrusted and personal funds; ·a complete failure to track settlement proceeds; total disregard of the status of accounts into which entrusted funds were placed, resulting in a repeated overdraft condition; the indiscriminate movement of monies between accounts; and the disregard of inquiries concerning the status of funds. *See, e.g., Utley*, 698 A.2d at 450; *Pels*, 653 A.2d at 390–91; *Micheel*, 610 A.2d at 232–33. All of these actions reveal an intent by the attorney "to deal with and use funds escrowed for clients as his own" or an unacceptable disregard for the security of client funds. *Hines*, 482 A.2d at 380.

In *Micheel*, for example, we held that recklessness was shown by the attorney's indiscriminate writing of checks on a commingled account, with no attempt to keep track of client funds, at a time when the attorney "knew or should have known the account was overdrawn." *Micheel*, 610 A.2d at 236. In *Pels*, the determination of recklessness was based on (i) the indiscriminate mingling of personal and client funds for over nearly a year, with the drawing of a large number of personal checks and unrelated checks on an operating account where settlement funds had been deposited; (ii) the repeated overdraft condition of the account and repeated dis-

---

3. *See, e.g., In re Reed*, 679 A.2d 506, 508 (D.C.1996) ("[B]y establishing inadvertence a respondent can avoid the more serious sanction of disbarment."); *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983) (respondent's "defense of inadvertence [was] ... insufficient to defeat the charges against him").

4. Although the standard for presumptive disbarment laid down in *Addams* is misappropriation that "resulted from more than simple negligence," neither the Board nor Bar Counsel suggests—nor has either of them previously argued to the court, to our knowledge—that

there might be an intermediate level of culpability, such as "gross negligence," short of recklessness but which would still warrant the *Addams* sanction. In our view, further differentiating the level of fault that warrants disbarment in this manner would unnecessarily complicate the already difficult task of deciding whether misappropriation is "merely negligent" or instead intentional/reckless. *Cf., e.g., Faunteroy v. United States*, 413 A.2d 1294, 1299 (D.C.1980) ("The touchstone of gross negligence is recklessness.").

honoring of checks to a medical provider; (iii) the pervasive failure to maintain contemporaneous records of client funds in accounts; and (iv) the failure to account for or to deliver to the client funds owed her, which may have been the result of "accounting records and procedures ... so hopelessly inadequate that [respondent] may have been incapable of rendering an accounting." *Pels,* 653 A.2d at 392 n. 8. And in *Utley,* we stated that "[r]espondent's flagrant disregard of the court's inquiries [into her actions in taking unauthorized fees from an estate] for nearly two years is an aggravating factor of sufficient magnitude to compel us to conclude that she was reckless [in taking unauthorized commissions and retaining unauthorized estate funds]." *Utley,* 698 A.2d at 450.

 These and other decisions, *see Berryman,* 764 A.2d at 768–70 (summarizing cases), demonstrate that the central issue in determining whether a misappropriation is reckless is *how* the attorney handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds. *See Micheel,* 610 A.2d at 236 (respondent's conduct revealed a "recklessness disregard for the security of his client's funds"); BLACK'S LAW DICTIONARY 1277 (7th ed.1999) (recklessness is a "state of mind in which a person does not care about the consequences of his or her action"); 57 AM.JUR.2D *Negligence* § 302 (1989) ("[R]eckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts that would disclose this danger to any reasonable person.").

## B. Application of Principles

 To establish reckless misappropriation in this case, then, Bar Counsel had to prove, by clear and convincing evidence, conduct sufficient to support an inference that Anderson purposely dealt with and used the funds owed to Phillips & Green as his own, or else that he consciously disregarded the risk that those funds would be used for unauthorized purposes. Specifically, Bar Counsel could have demonstrated recklessness by proof that Anderson engaged in a pattern or course of conduct demonstrating an unacceptable disregard for the welfare of entrusted funds, such as the indiscriminate commingling of entrusted and personal funds, the failure to track settlement proceeds, the disregard of the status of accounts into which entrusted funds were placed, or permitting the repeated overdraft condition of an account. Alternatively, it would have been sufficient for Bar Counsel to prove that Anderson failed to pay the Phillips & Green bill despite knowledge that it remained unpaid, for then the inference would be permissible—indeed, compelled—that he had chosen to use client-obligated funds for unauthorized purposes.[5]

Bar Counsel failed to prove by clear and convincing evidence a pattern of conduct by Anderson manifesting a reckless disregard of his duty to safeguard the Phillips & Green funds. It is true that he maintained no separate trust or escrow account, and that his system of documenting client transactions essentially consisted of mak-

---

5. The question whether an attorney's misappropriation was reckless, or merely negligent, is one of "ultimate fact"—a "conclusion of law"—on which the Board makes its own determination. *Micheel,* 610 A.2d at 234–35. We in turn "review [that decision] de novo." *Berryman,* 764 A.2d at 766; *Utley,* 698 A.2d at 449.

ing notations on case files, preparing a settlement sheet for receipts and disbursements after a settlement, and attempting to make all necessary distributions promptly while keeping record of them "in [his] head." As the Board recognized, this "system" was obviously deficient and invited mistakes especially when two cases were settled at around the same time. But our decisions, by clear implication, have rejected the proposition that recklessness can be shown by inadequate record-keeping alone combined with commingling and misappropriation. In *In re Reed*, 679 A.2d 506 (D.C.1996), for example, we sustained the Board's determination that the misappropriation had resulted from simple negligence even though the attorney's "accounting practices were practically non-existent and careless at best. She did not keep a running balance, her check ledger had no memos, and she did not keep track of the [entrusted] funds." *Id.* at 509. Likewise, *In re Choroszej*, 624 A.2d 434, 436 (D.C.1992), we agreed that the misappropriation resulted from negligence even though the attorney had "failed to maintain documentation on his clients' fund[s]" and "was unable to produce a ledger of the checks he wrote on the client trust account or bank statements and accounting records showing [w]hat was paid [to] or received from his clients." *See also In re Harrison*, 461 A.2d at 1036 (inadvertent misappropriation resulted from attorney's "failure to keep proper records"). The aggravating factors beyond poor rec-

ord-keeping which the court has found indicative of recklessness are not present in this case: the proof that Anderson failed to pay a single client obligation is not evidence that he flagrantly disregarded the integrity of third-party funds; he did not indiscriminately write checks on the operating account; and he did not write checks that were dishonored or that caused the account to be in overdraft.[6]

 We do not minimize Anderson's failure to maintain either a separate trust account or more than what are charitably described as makeshift records for tracking client obligations. More than twelve years ago—before respondent was even a member of the Bar—the court warned "that in future cases of even simple 'commingling' " a serious disciplinary sanction would be in order. *In re Hessler*, 549 A.2d 700, 703 (D.C.1988). But the sanction of six months' suspension recommended by the Board in this case is a serious one, and the *Addams* sanction of presumptive disbarment for misappropriation is, with one exception, the most severe one our system can impose.[7] We are not prepared to hold—and our cases preclude us from holding—that Anderson's failure to pay the Phillips & Green bill as a result of inadequate record-keeping is enough to support a finding of recklessness with the consequence *Addams* would require, in the absence of some further aggravating circumstance.

**6.** Bar Counsel points to the fact that Anderson allowed the non-D.C. Bar member with whom he shared office space to be a signatory on the operating account, with power to write checks after "having a conference with" Anderson about the item. While this was some additional evidence of carelessness on respondent's part in limiting access to client funds, there was no evidence that the other attorney used the account during the period when the balances dropped below the

amount due Phillips & Green, and we do not think it a sufficient aggravating factor to raise Anderson's misconduct to the level of recklessness.

**7.** The exception is the automatic disbarment—subject only to the defense of pardon—required by D.C.Code § 11–2503(a) (1995) upon proof of a final judgment of conviction for a crime involving moral turpitude.

■ Bar Counsel argues, however, that that circumstance is present in the fact, which the Hearing Committee found, that Anderson failed to respond to reminders by the client that the medical bill remained unpaid. If in fact Anderson ignored or willfully blinded himself to such reminders, then we would have no difficulty sustaining the Committee's determination of recklessness. But, as the Board correctly determined, that finding is not supported by substantial evidence in the record, *see In re Evans*, 578 A.2d 1141, 1142 (D.C.1990), particularly when the Committee's "factual findings must be supported by clear and convincing evidence." *Williams*, 464 A.2d at 119. It appears that the Hearing Committee confused Calligan's repeated messages to respondent before the settlement of the claim with their contacts—*i.e.*, the relative absence of contacts—after the settlement. Before he was told by Phillips & Green two months after the settlement that the medical bill had been "discharged," Calligan left messages on Anderson's answering machine in reaction to calls he was still receiving from the collection agency, but (i) he could not recall whether he said anything more in those messages than "please call me," and (ii) he was certain that after the settlement he and Anderson had never spoken about the unpaid bill. There is thus no clear and convincing evidence contradicting Anderson's testimony that he did not learn that he was mistaken in believing he had paid the bill until he contacted Phillips & Green about an unrelated matter over a year later.

Bar Counsel argues, nonetheless, that the Hearing Committee made a general finding that Anderson's explanation was not credible, and that the Board failed to give this determination the proper deference owed to the finder of fact. We take this argument seriously because of the importance our disciplinary system accords to the Hearing Committee as the first-level adjudicator and trier of the facts, *see Micheel*, 610 A.2d at 234; hence any indication that the Board substituted its view of the credibility of a witness for the Committee's would endanger that basic allocation of decisionmaking responsibility.[8] For the following reasons, however, we agree with the Board that the Hearing Committee's finding as to credibility does not warrant the normal deference in this case.

First, the Committee explained that Anderson's "self-serving testimony on inadvertence and regret are not credible given the time taken to pay the medical providers and the failure to respond to Mr. Calligan's payment status inquiries." We set aside the adjective ("self-serving") because testimony by a respondent in explanation of his conduct is almost by definition self-serving. Moreover, as we have seen, the record does not support the finding that respondent ignored post-settlement inquiries by Calligan, and if nothing alerted him to the fact that his belief that he had paid the bill was mistaken, then "the time taken to pay the medical providers" has no ultimate significance. Second, the Committee's credibility assessment gives no indication that it was based on respondent's demeanor in testifying and responding to questions. *See In re Temple*, 629 A.2d 1203, 1208–09 (D.C.1993) ("The factfinder who hears the evidence

---

8. The court has not had occasion to consider the scope of the Board's internally adopted Rule 13.6 which permits it to "affirm, modify, or expand the *findings* and recommendation of the Hearing Committee" (emphasis added), but presumably that authority allows the Board only to "make additional findings of fact ... which are uncontested on the record," *i.e.*, which do not contradict Committee findings that are supported by substantial evidence. *See In re Chang*, 694 A.2d 877, 879 n. 3 (D.C.1997) (Board report).

and sees the witnesses is in a better position to make [credibility] determinations, having the benefit of those critical first-hand observations of the witness' demeanor or manner of testifying which are so important to assessing credibility."). Rather, besides resting on a mistaken understanding as to the reminders Anderson had been given, the Committee's disbelief of his explanation appears to have derived significantly from its finding that he had "fail[ed] to conform [his] bookkeeping practices to accepted norms (indeed, required protocols)." That is, the Committee found too convenient respondent's explanation of "honest, good-faith lapse in memory," because—it stated—"[i]t is easy ... to imagine losing track of payment obligations when one uses no written or computer-based method of bookkeeping." It was this "willful failure" to maintain any accounting system that, in the Committee's view, "precludes [respondent's] simple negligence defense." The Board correctly recognized this analysis to be in the nature of a legal conclusion rather than a finding of fact, and that our decisions do not sustain it without additional circumstances demonstrating recklessness.[9]

Because of the disagreement between the Board and the Hearing Committee on the issue of Anderson's degree of culpability, we have carefully examined the record to decide whether, in light of our precedents, his misappropriation carried with it aggravating circumstances enough to warrant the severe discipline *Addams* imposes. Ultimately, we agree with the Board that his misappropriation did not rise to that level, consisting essentially as it did of a single mistaken failure to pay a client obligation aggravated by commingling and inadequate record-keeping—failings which, though inexcusable, do not take it beyond negligence under our decisions.

We therefore accept the Board's recommendation that respondent be, and he hereby is, suspended from the practice of law in the District of Columbia for six months. The time before which respondent may apply for reinstatement will commence upon his filing of the affidavit required by D.C. Bar Rule XI, § 14. *See* D.C. Bar Rule XI, § 16(c).

*So ordered.*

---

9. The dissenting Board member found additional support for the Committee's disbelief of Anderson in the fact that he wrote two checks for himself and/or for office expenses soon after the settlement, and that his law practice had financial difficulties. But if Anderson mistakenly but honestly believed that he had paid all of the Calligan obligations, his withdrawal of funds from the operating account to pay himself and other debts is not itself clear and convincing evidence that he intended to misuse client funds.