*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-BG-630

IN RE SANDY V. LEE, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 361460)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN 451-07)

(Argued March 13, 2013                    Decided July 17, 2014)

*Sandy V. Lee*, pro se.

*Julia L. Porter*, Senior Assistant Bar Counsel, with whom *Wallace E. Shipp, Jr.*, Bar Counsel, and *Jennifer Lyman*, Senior Assistant Bar Counsel, were on the brief for petitioner.

*Elizabeth J. Branda*, Executive Attorney, Board on Professional Responsibility, for petitioner.

Before WASHINGTON, *Chief Judge*, BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*.

PER CURIAM: This matter comes before us upon the report and recommendation of the Board on Professional Responsibility ("Board"). The Board found that respondent Sandy V. Lee committed intentional misappropriation by negotiating a check without the authorization or endorsement of one of the named payees and taking his fee from the proceeds. The Board has unanimously recommended to this court that respondent be disbarred based upon this intentional misappropriation as well as other misconduct, particularly respondent's flagrant dishonesty and false testimony before the Hearing Committee. Respondent takes exception to the Board's findings of fact and its legal conclusion that he intentionally misappropriated funds. Respondent also contends that the proposed sanction recommended by the Board is unwarranted. Bar Counsel agrees with the Board's conclusion that respondent intentionally misappropriated funds and that disbarment is the proper sanction for respondent's actions, but disagrees with the Board's legal analysis. For the reasons stated herein, we hold that respondent intentionally misappropriated funds to which a third party had a just claim in violation of Rule of Professional Conduct 1.15 (c), and thus order that respondent Sandy V. Lee be disbarred.

## FACTUAL SUMMARY

In November of 2005, Agnes Tataw ("Ms. Tataw") purchased property located at 1423 Montello Avenue, N.E., Washington. D.C. ("the Property") for a purchase price of $375,000. She took out two loans from WMC Mortgage Corporation ("WMC") to finance the purchase: a $300,000 first-position loan and a $75,000 second-position loan. As security for the mortgages, Ms. Tataw also executed first and second deeds of trust on the Property. The Deed of Trust securing the $300,000 loan was a standard Fannie Mae/Freddie Mac form, which required her to maintain insurance on the Property, among other things. The insurance policy was required to include a "standard mortgage clause and [] name Lender as mortgagee and/or as an additional loss payee." The Deed of Trust additionally stated that:

> In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds . . . shall be applied to restoration or repair of the Property . . . . During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. . . . Fees for public

> adjusters, or other third parties retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.[1]

Ms. Tataw later obtained insurance on the property with Encompass Insurance ("Encompass") in accordance with this requirement. In January of 2006, Wilshire Credit Corporation ("Wilshire") began to service the loan and was substituted as the mortgagee and interested party on the Encompass policy. In March of 2006, the Property was vandalized, and in April of 2006 Ms. Tataw filed a claim with the insurer. Encompass investigated the claim and obtained a repair estimate of $15,369.32.

In October of 2006, Ms. Tataw retained respondent Sandy V. Lee of Blair & Lee, P.C., to represent her in pursuing the claim against Encompass. The parties executed a retainer agreement which required Ms. Tataw to pay a fee of "one-third (33 1/3%) of the gross amount recovered" if she received her money prior to litigation, and 40% if she did not receive her money until after suit was instituted.

---

[1] The Hearing Committee found that such a provision "is a standard provision in residential mortgage loans. It protects the lender's interest in the property by giving the lender the right to hold the insurance proceeds to ensure that they are used for their intended purpose of repairing and restoring the property."

In January of 2007, Encompass agreed to pay the $15,369.32 claim based on the repair estimate. Encompass sent the check to respondent, payable to "Agnes Tataw, Wilshire Credit, and Blair and Lee, P.C." The Hearing Committee accepted respondent's testimony that when he received this check on January 16, 2007, he did not have a copy of the insurance policy. Still, the Hearing Committee found that respondent knew that Wilshire had an interest in the proceeds of the check; when he received the check, respondent knew that Wilshire held the mortgage loans on the Property and was a payee on the check, and he knew that he needed Wilshire's consent before he could negotiate that check. Moreover, the same day that respondent received the check he called Wilshire and a claims representative told him to endorse the check and send it—along with the contractor's and insurer's estimates—to Wilshire's offices on "Millikan" in Beaverton, Oregon.

Three days after he received the check, respondent faxed a letter to Wilshire addressed to an unnamed "Hazard Claims Director" at the company's "Millikan Way" office. The letter read:

> Included with this letter is a copy of a check received on behalf of our client from her home owner's insurance company for loss to her house. The policy, as I have been told, for some reason requires that your name be placed on the check for compensation for losses, despite the fact that no funds are going to your company. Our

firm is owed and collecting its fee for services rendered and for future services. Please be advised that unless I have a letter by facsimile from you opposing my action, I will sign your company's name to the check, deposit it[,] collect my fee and hold all other funds until you and your customer are satisfied. The contractors' estimates are being obtained and will be forwarded to you upon receipt.

Less than five hours after sending this fax and without any further attempt to contact Wilshire, at 6:43 p.m. on January 19, 2007, respondent deposited the check into the firm's trust account at SunTrust. Respondent caused three endorsements to be affixed to the back of the check: a handwritten endorsement of "Blair & Lee, P.C.," Ms. Tataw's name, and the firm's restrictive endorsement stamp. No endorsement representing payee Wilshire appeared on the check. The Hearing Committee found that Ms. Tataw authorized respondent to sign her name to the check, although he had failed to indicate that he had signed it on her behalf. The Hearing Committee also found that respondent had "intentionally" made an "effort to convey that all three required endorsements had been made, beginning with a handwritten endorsement for 'Blair & Lee, P.C.' that was "difficult to read, and [] intentionally so." Wilshire did not endorse the check nor consent to respondent negotiating the check or depositing it in his firm's trust account.

On either January 19 (the day that he faxed Wilshire the letter) or the next business day, January 22, 2007, respondent caused three checks totaling $5,123.10

(his fee) to be presented and paid by SunTrust.[2]  The Hearing Committee rejected as false respondent's testimony that he believed he was authorized to sign Wilshire's name to the check and deposit it because respondent "**did not**, in fact, sign Wilshire's name to the check, even though he told the Wilshire representative that he would, and said so in the letter that he wrote . . . .  Instead, he used an intentionally illegible 'Blair & Lee' endorsement."  Thus, the Hearing Committee found that respondent knew he was not authorized to sign Wilshire's name to the check.  Finally, the Hearing Committee found that respondent "caused the check to appear as if it had three endorsements in order to cause the SunTrust bank teller to believe that the check was properly endorsed by the three payees identified on the front of the check."

Six months later, in July of 2007, the contractor sent respondent an estimate of $20,226.67 to repair Ms. Tataw's property.  Respondent faxed a letter to Wilshire on July 26, 2007, informing them that his firm was holding the balance of the insurance check—the net claim proceeds minus his fee—and requesting approval for the repair work to begin on the property.  Steven Bonfiglio ("Mr. Bonfiglio"), Wilshire's in-house counsel and Assistant Vice President, responded

---

[2]  The three checks were made out as follows:  the first for $1,500, payable to "Blair & Assoc Payroll Acc # 1372"; the next for $1,061.55, payable to "Walter Blair"; and the third for $2,561.55, payable to respondent.

by fax the same day expressing concern that respondent might have negotiated the insurance check without Wilshire's consent, and emphasizing that the insurance proceeds were to be used to repair the Property that secured Wilshire's loan. He requested that respondent provide more information and that respondent "retain all of the fees and costs appropriated by your firm from this check." Respondent did not replace the legal fees into the firm's trust account. That evening, respondent sent another fax stating "Client's money in trust account," along with a copy of his January 19, 2007, fax to Wilshire, a copy of the check, and the contractor's estimate of $20,226.27. Mr. Bonfiglio responded the next day by fax, stating that Wilshire had never authorized respondent to endorse the check, Wilshire's records reflected that Wilshire had instructed him to endorse the check and send it to them, and that by defying those orders and endorsing the check, respondent had "interfered with the operation of the contract between Wilshire and Ms. Tataw, specifically, the policies and procedures for the disbursement of the insurance proceeds which ensure that [Wilshire's] security interest is properly repaired." Mr. Bonfiglio also demanded that respondent send the $15,369.32 so that it (Wilshire) and Ms. Tataw could coordinate the repairs to the property.

Respondent did not respond to the July 27, 2007, communication with Mr. Bonfiglio nor did he forward the balance of the insurance proceeds.[3] Instead, respondent instituted a civil action on behalf of Ms. Tataw against Wilshire in D.C. Superior Court on August 2, 2007. *Tataw v. Wilshire Credit Corp.*, 2007-CV-5357. Before the Hearing Committee, respondent testified that the basis for this suit was that he wanted a declaration that it was proper for him to endorse Wilshire's name to the check and take his fee.[4] In an attempt to avoid litigation, Wilshire agreed that Ms. Tataw could use the remaining funds to repair the property. Respondent agreed that Ms. Tataw would dismiss the suit on these terms, as long as the parties also agreed to abandon all other types of complaints "stemming from this case" as they were "likely to be without merit." Wilshire did not agree to that final waiver term because it sought to file a Bar complaint against respondent.

---

[3] Respondent failed to turn over the balance to Wilshire despite the fact that its entitlement to those funds was undisputed. As the Hearing Committee explained, there was evidence that respondent "clearly understood that Wilshire had an interest in controlling disbursement, at least of the amount that remained after he took his fee. Indeed, he told Ms. Tataw that she could not have the proceeds without Wilshire's permission."

[4] However, in the Complaint he did not disclose that: 1) Wilshire was a payee on the check; 2) respondent negotiated the check without Wilshire's endorsement or permission; 3) respondent withdrew for himself a third of the funds a day after negotiating the check; and 4) respondent refused to return the funds or place them in trust after Wilshire demanded that he do so.

Wilshire repeatedly asked that respondent dismiss the lawsuit, explaining that its dispute was not with Ms. Tataw but with respondent, and that if it had to hire a lawyer to defend in the suit its fees and costs would be billed to Ms. Tataw's mortgage loan under the terms of that agreement. Mr. Bonfiglio even wrote to respondent and "beg[ged] [the firm to] take the funds from [the] client trust account and repair her home." On September 4, 2007, Wilshire filed a motion to dismiss or for summary judgment arguing that there was no dispute between Wilshire and Ms. Tataw over use of the funds because both agreed they should be used to repair the property. In response, respondent prepared an affidavit that Ms. Tataw signed, which stated that Wilshire had agreed to release the funds for repair of the property but that they would "attempt later to bill me to pay its attorney's fees due to its six (6) months delay in approving the release of funds." Respondent knew at the time that this was a false representation of the reason Wilshire would bill Ms. Tataw for its litigations costs and also misrepresented Wilshire's role in determining how the funds were to be used.

On October 18, 2007, the action was dismissed with prejudice because there was no dispute about how the funds should be used. As promised, and in accordance with the terms of the Deed of Trust, Wilshire assessed its attorney's fees against Ms. Tataw's mortgage loan. The remaining funds from the account

were paid out to Ms. Tataw and the contractor, who received only $9,246.22 although the estimate for repairs was $20,000. While some repairs might have been done on the Property, Wilshire was never made aware of them, and though Mr. Bonfiglio had requested that respondent provide him that information, respondent never did. The legal fees Wilshire assessed against Ms. Tataw's mortgage were never paid because after January of 2008, Ms. Tataw stopped making payments on her mortgage. Wilshire later foreclosed on the Property, selling it for $130,000, about one-third of the amount Ms. Tataw had purchased it for. On November 28, 2007, Mr. Bonfiglio reported respondent to Bar Counsel.

On August 18 and 27, 2009, an Ad Hoc Hearing Committee heard the testimony of Bar Counsel's three witnesses and admitted thirty-eight of Bar Counsel's exhibits. Respondent, who was represented by counsel, testified himself and called a single witness on his behalf. Respondent's exhibits were also admitted into evidence. The Hearing Committee concluded that respondent violated Rules 1.15 (b) and 1.15 (c)[5] of the Rules of Professional Conduct and recommended that respondent be disbarred. Bar Counsel did not file an exception to the Hearing Committee's report and recommendation, but respondent did. In its

---

[5] Rule 1.15 has been revised during the pendency of this appeal, so that Rule 1.15 (b) is now Rule 1.15 (c) and Rule 1.15 (c) is now Rule 1.15 (d). We refer to the version of Rule 1.15 in effect at the time of the conduct in question.

report and recommendation, the Board expressly adopted the Hearing Committee's findings of fact and recommendation that respondent be disbarred for intentional misappropriation, but found that respondent had only violated 1.15 (c) because 1.15 (b) and (c) were mutually exclusive, such that he could not have violated both. Bar Counsel agreed with the finding that respondent intentionally misappropriated funds in violation of Rule 1.15 (c), but differed from the Board in its legal analysis. Bar Counsel also disagreed that Rules 1.15 (b) and (c) are mutually exclusive, and thus argues that respondent should be found to have violated both. Respondent also takes exception to the Board's report and recommendation, raising numerous issues on appeal. We suspended respondent on an interim basis on August 9, 2012, and now consider the issues raised by both respondent and Bar Counsel, respectively.

## ANALYSIS

We accept the Board's findings of fact, "unless they are unsupported by substantial evidence of record," and review the Board's legal conclusions *de novo*. D.C. Bar R. XI, § 9 (h)(1); *In re Pierson,* 690 A.2d 941, 946-47 (D.C. 1997).[6]

---

[6] The Board, in turn, is required to accept the factual findings of the Hearing Committee that are supported by substantial evidence in the record, viewed in its

(continued . . .)

"The [Board]'s proposed sanction comes to this court with a strong presumption in favor of its imposition." *In re White*, 11 A.3d 1226, 1233 (D.C. 2011) (per curiam) (citations omitted). We adopt the recommended disposition of the Board, "'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Cleaver-Bascombe,* 986 A.2d 1191, 1194 (D.C. 2010) (per curiam) (quoting D.C. Bar R. XI, § 9 (h)(1)).

*Respondent's Exceptions*

Respondent challenges the Board's Report and Recommendation on a number of grounds, two of which can be disposed of summarily.[7]

First, respondent argues that the findings by the Board are not supported by substantial evidence in the record. In actuality, however, respondent's argument is merely that the Board adopted the Hearing Committee's findings, which he characterizes as arbitrary and capricious because he disagrees with those findings.

entirety. *In re Micheel,* 610 A.2d 231, 234 (D.C. 1992). "However, the Board owes no deference to the hearing committee's determination of ultimate facts, which are really conclusions of law." *Id.* (internal quotation marks omitted).

[7] Respondent raises various issues throughout his brief, but lists only six in his "Issues Presented" section. This opinion attempts to address all issues raised, though they are consolidated.

For example, respondent argues that "the Board adopted the finding that [respondent] testified falsely that he did not receive Wilshire's instruction to endorse and forward the insurance check," which was "without basis in the record." There was, of course, substantial evidence to support the Hearing Committee's finding that he testified falsely in this regard. First, respondent testified that he called Wilshire the day that he received the check and, though he first denied being told to endorse the check and forward it to Wilshire's "Millikan Way" address, he later testified that he didn't know if anyone had told him to endorse it and send it to Wilshire, indicating that "they could have mumbled it in a conversation or he might not have understood it." After learning that Wilshire had a record of the conversation and after being asked how he knew to send his letter to Wilshire at its Millikan Way address, respondent answered "[p]robably because somebody at the company gave me an address, probably that individual I talked to on the 16th." In fact, before the Hearing Committee Wilshire presented a contemporaneous business record documenting that during the call, its customer service representative, Ms. Kehoe, told respondent that he and Ms. Tataw should endorse the check and then send it to the Millikan Way address. This was more than substantial evidence from which the Hearing Committee and the Board could find that respondent's testimony on this issue was false. Respondent's similar arguments that the Board's findings of fact are not supported by substantial

evidence are also without merit because there is substantial evidence in the record to support each of the Board's factual findings.

Respondent also contends that the Board incorrectly rejected his argument that litigation of the disciplinary charges against him was barred by the doctrines of *res judicata* and/or collateral estoppel. Underlying this argument is his contention that Wilshire abandoned its claim to the $5,123.10 that respondent took from the insurance proceeds for legal fees during the declaratory action in Superior Court, and therefore, relitigation of respondent's entitlement to those fees is now barred. However, as the Board correctly recognized, the Superior Court "did not decide whether respondent was entitled to take his fee from the insurance proceeds or whether doing so constituted a disciplinary violation."[8] Because the issues raised

---

[8]     In granting Wilshire's motion for summary judgment and dismissing the action with prejudice, the Superior Court explained that:

> It is uncontroverted that defendant is not presently making any demand that all of the funds be turned over to it and specifically endorses plaintiff's request that the remaining funds be turned over to plaintiff. Between *plaintiff and defendant*, there is no matter presently in controversy and nothing for this court to decide.

Importantly, in that action Ms. Tataw was the plaintiff, not respondent, who was merely representing her. As such, there was no litigation concerning whether respondent was in fact within his right to take his fee from the insurance proceeds,

(continued . . .)

in this disciplinary proceeding were not raised and decided in any prior litigation, this disciplinary action is not barred by the doctrine of *res judicata*. *See Caloramis v. Caloramis*, 3 A.3d 1186, 1190 (D.C. 2010) (explaining that in determining whether *res judicata* applies, this court considers: "(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case"); *see also In re Stanton*, 589 A.2d 425, 426 (D.C. 1991) (per curiam) (emphasis added) (explaining that the doctrine of *res judicata* applies to disciplinary proceedings "so as to prevent litigation of defenses raised . . . *in prior disciplinary proceedings*").

Respondent's remaining arguments merit a more substantial discussion. First, respondent challenges the Board's legal interpretation that Wilshire had a "just claim" to the proceeds of the insurance check because respondent's conduct evidenced his tacit agreement to be bound by the mortgage contract between Ms. Tataw and Wilshire, despite the fact that he was not a party to that contract. Respondent argues that under a correct interpretation of Rule 1.15 (c), Wilshire did

---

and there was certainly no litigation with respect to whether doing so violated the Rules of Professional Conduct.

not have a just claim to the proceeds of the insurance check and, therefore, he did not violate the rule when he failed to safeguard the money in his possession. Bar Counsel also takes exception to the Board's legal interpretation of Rule 1.15 (c), but argues that even under a correct legal interpretation there was substantial evidence that respondent violated Rule 1.15 (c). Next, respondent argues that even if Wilshire had a just claim to the insurance proceeds, the company waived its right to object to his endorsement and negotiation of the settlement check by failing to respond to his several communications concerning the funds. Finally, respondent argues that even if his conduct violated Rule 1.15 (c), disbarment is not the proper sanction.

We turn first to the question of whether the Board's legal interpretation of Rule 1.15 (c) is correct. Rule 1.15 (c) provides:

> When in the course of representation a lawyer is in possession of property in which interests are claimed by the lawyer and another person, or by two or more persons to each of whom the lawyer may have an obligation, the property shall be kept separate by the lawyer until there is an accounting and severance of interests in the property. If a dispute arises concerning the respective interests among persons claiming an interest in such property, the undisputed portion shall be distributed and the portion in dispute shall be kept separate by the lawyer until the dispute is resolved. Any funds in dispute shall be deposited in a separate account meeting the requirements of paragraph (a).

Rule of Professional Conduct 1.15 (c). The comments to the rule illustrate the

extent to which a lawyer's duty to a third party extends in such situations:

> Third parties . . . may have just claims against funds or
> other property in a lawyer's custody. A lawyer may have
> a duty under applicable law to protect such third-party
> claims against wrongful interference by the client, and
> accordingly may refuse to surrender the property to the
> client.

Rule of Professional Conduct 1.15 (c), cmt. 4.[9] This court has also considered the

question of what constitutes a just claim for purposes of Rule 1.15. The leading

case on this issue is *In re Bailey*, 883 A.2d 106 (D.C. 2005). In that case, this court

found that Mr. Bailey misappropriated funds when he "borrowed" the entirety of a

client's settlement award and used it for his own purposes, despite having agreed

to use some of the funds to pay the medical provider, who had treated the client

after she suffered a personal injury. *Id.* at 121-22. The court explained that unlike

the claims of a client, which do not need to be justified in order to bar the lawyer

from making a distribution, claims of a third party require something more—a

"just claim"—"as to which 'applicable law' imposes a duty on the lawyer to

distribute the funds to a third party or withhold distribution." *Id.* at 116-17

(citations omitted). A "just claim," the court explained:

> [I]s one that relates to the particular funds in the lawyer's
> possession, as opposed to merely being (or alleged to be)

---

[9] This is now Rule of Professional Conduct 1.15 (d), cmt. 7.

a general unsecured obligation of the client. . . . Examples of "just claims" include: (1) "an attachment or garnishment arising out of a money judgment against the client"; (2) "a statutory lien"; (3) "a court order relating to the specific funds in the lawyer's possession"; and (4) "a contractual agreement."

*Id.* at 117 (quoting D.C. Ethics Op. No. 293, "Disposition of Property of Clients and Others Where Ownership is in Dispute" (adopted July 20, 1999, revised Nov. 16, 1999) [hereinafter "D.C. Ethics Op. No. 293"]). With respect to the fourth example, a "contractual agreement," we explained, "the reference is to a contractual agreement made by the client and *joined in or ratified by the lawyer* to pay certain funds in the possession of the lawyer . . . to a third party." *Id.* (emphasis added) (citations and internal quotation marks omitted).

The Board, apparently under the belief that *In re Bailey* provided the exclusive circumstances under which a third party could have a "just claim" to money being held by an attorney, reasoned that respondent tacitly agreed to be bound by the terms of the Deed of Trust between Wilshire and Ms. Tataw by his extensive efforts to secure Wilshire's permission to negotiate the check and, therefore, he was bound by the terms of the Deed of Trust that established Wilshire's just claim to the proceeds of the insurance payment.

Respondent argues that the Board's interpretation is flawed because the requirement that a lawyer "voluntarily agree to" or "ratify" a contractual agreement between the client and a third party "usually refers to a written agreement signed by the attorney." And, therefore, because he never signed any document consenting to be bound by the mortgage contract between Ms. Tataw and Wilshire, "the Board imposed an agreement where none existed." Respondent also argues that because there was no evidence that he orally agreed to be bound by the mortgage contract, Wilshire could not have had a "just claim" to the funds in his possession under any contractual theory.

While the facts of this case do not fit squarely within any of the four discrete examples listed in *In re Bailey*, that case is nevertheless controlling. In *In re Bailey*, this court adopted the definition of "just claim" that was earlier articulated in D.C. Legal Opinion No. 293, which is that a just claim is one as to which "applicable law imposes a duty on the lawyer to distribute the funds to the third party or withhold distribution." 883 A.2d at 116-17 (internal quotation marks omitted). The four examples of just claims outlined in the opinion are not meant to be an exhaustive list of circumstances where applicable law imposes such a duty on lawyers. Here, Wilshire was listed as a payee on the insurance check, and it is settled law that a check, which is a valid legal instrument, cannot be negotiated

without the endorsement of all named payees. D.C. Code § 28:3-110 (d) (2012) ("If an instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them."). Thus, because Wilshire was listed as a payee on a valid legal instrument, "applicable law" gave Wilshire a "just claim" to the proceeds of the check and created a duty on the part of the respondent in this case to safeguard the check until the dispute over its negotiation and entitlement to its proceeds could be resolved.

Importantly, the facts show that respondent was well aware that as a payee on the check, applicable law conferred on Wilshire a just claim to the funds.[10] Not only did respondent make repeated efforts to obtain Wilshire's authorization to take his fee from the insurance proceeds upon receiving the check but he also testified that he denied Ms. Tataw's request for access to the insurance proceeds on the basis that he could not do so without Wilshire's permission. The fact that respondent later initiated a declaratory judgment action against Wilshire further demonstrates that he understood that as a payee on the check, Wilshire had a just claim or entitlement to the funds. Though respondent clearly knew that ownership

---

[10] While both the Board and Bar Counsel seem to recognize that respondent knew of Wilshire's interest prior to receiving the insurance check, at the very least by the time he received that check respondent had to have known that Wilshire had a just claim to the insurance proceeds "for the very simple reason that it was a payee on the check."

of the funds was disputed, he failed to keep the disputed monies separate until an accounting could be completed, as required by Rule 1.15 (c), and even decided to withdraw his fee the next business day after depositing the funds into his firm's trust account. Thus, the Hearing Committee and the Board correctly determined that respondent was aware that Wilshire had a just claim to the funds and that respondent intentionally misappropriated those funds in violation of Rule 1.15 (c). *In re Anderson*, 778 A.2d 330, 339 (D.C. 2001) (emphasis added) (citing *In re Micheel*, 610 A.2d at 236) (explaining that whether a misappropriation is reckless rather than merely negligent turns on "how the attorney handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either *an intent to treat the funds as the attorney's own* or a conscious indifference to the consequences of his behavior for the security of the funds").

Alternatively, respondent, relying on *In re Thomas*, 740 A.2d 538 (D.C. 1999), argues that even if Wilshire did have a just claim to the funds, the company nevertheless waived its objection to his endorsement and negotiation of the insurance check by failing to respond to his communications or to otherwise take required actions to indicate its lack of consent. However, unlike in *In re Thomas*, where there was some evidence that the insurer had actually waived its entitlement

to a lien on the property, 740 A.2d at 546-47, there is no such evidence of a waiver in this case. Importantly, here the Hearing Committee found that: respondent falsely testified when he denied that a customer service representative at Wilshire told him to endorse the check and forward it; there was absolutely no evidence to suggest that respondent actually attempted to call Wilshire several times over the next few days to obtain authorization to negotiate the check; the July 19, 2007, fax was not a good-faith effort to obtain Wilshire's consent; and during pendency of the declaratory judgment litigation, Wilshire repeatedly refused to ratify respondent's conduct. As such, Wilshire did not waive its right to object to respondent's unauthorized endorsement and negotiation of the insurance check, which constituted intentional misappropriation.

This court will adopt the recommended disposition of the Board, "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted," *In re Cleaver-Bascombe,* 986 A.2d 1191, 1194 (D.C. 2010) (per curiam) (quoting D.C. Bar R. XI, § 9 (h)(1)), and in this case the Board recommended the presumptive sanction for intentional misappropriation, which is disbarment. *Matter of Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc).

Respondent argues, however, that disbarment is an improper sanction, citing *In re Romansky*, 938 A.2d 733 (D.C. 2007) to support that proposition. *In re Romansky* is clearly distinguishable from the instant case. First, *In re Romansky* is a billing fraud case in which this court, sitting en banc, concluded that Romansky did not violate Rule 8.4 (c) when he charged two clients for more hours than his attorneys worked because there was not "clear and convincing evidence" that he acted recklessly rather than negligently. *Id.* at 742. This court concluded that there was substantial evidence in the record that he had made "a good faith mistake" that was "inconsistent with dishonest intent," including the fact that the law firm he worked for had recently changed its billing practices, the bills at issue were sent out shortly after the new policy was initiated, two attorneys in the firm testified that Romansky could have been confused as to which policy applied to the two clients at issue, and Romansky was "responsible for an unusually large number of bills totaling millions of dollars." *Id.* at 741. Because we concluded that Romansky's violation of Rule 8.4 (c) was negligent, as opposed to reckless or intentional, we agreed with the Board's recommendation that a thirty-day suspension in that case was the proper sanction for the negligent submission of false documents. *Id.* at 743.

The instant case, however, falls within the *Addams* line of cases, *Matter of Addams*, 579 A.2d at 190, in which the respondent intentionally misappropriated client funds from a trust account that were intended to be used to pay the holder of the client's promissory note. *Id.* at 192. Like in the instant case, in *Matter of Addams* it was not the client that was upset with the lawyer's conduct, but rather, the third party note holder. *Id.* Upon consideration of the presumptive sanctions for intentional misappropriation in other jurisdictions, this court concluded that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *Id.* at 191. Thus, although the respondent in that case had been practicing law for twenty-two years without any disciplinary sanctions, and "while the complainant was the disgruntled third-party note holder and not Addams' client, that circumstance offer[ed] no solace when the purpose of the severe sanction is to maintain public confidence in the bar," *id.* at 199, such that disbarment was the proper sanction. As in *Addams*, *supra*, the findings of the Board in this case support the conclusion that respondent intentionally misappropriated funds to which a third party had a just claim. Therefore, disbarment is the proper sanction unless extraordinary circumstances warrant a lesser sanction and those extraordinary circumstances are not present in this case. *See, e.g.*, *In re Kersey*, 520 A.2d 321, 326 (D.C. 1987) (explaining that the fact that

an attorney suffered from alcoholism, which played a role in his misconduct, was a mitigating factor to be considered in determining how he should be sanctioned).

Under the circumstances here, we are satisfied that imposing the presumptive sanction of disbarment "would [not] foster a tendency toward inconsistent dispositions for comparable conduct or otherwise be unwarranted." *In re Cleaver-Bascombe*, 986 A.2d at 1194; *see also Matter of Addams*, 579 A.2d at 199. As such, respondent is disbarred from the practice of law in the District of Columbia.

*Bar Counsel's Remaining Exception*

Bar Counsel takes exception to the Board's legal conclusion that Rules 1.15 (b) and (c) are mutually exclusive, such that respondent could not have violated both. However, having concluded that respondent committed intentional misappropriation in violation of Rule 1.15 (c), the presumptive sanction for which is disbarment, we need not reach this issue in this appeal. *See In re Corizzi*, 803 A.2d 438, 439 n.1 (D.C. 2002) (citations omitted) (declining to address Bar Counsel's exceptions challenging the Board's failure to find additional ethical

violations because disbarment was warranted based on the violations about which there was no dispute).

Accordingly, it is therefore ORDERED that respondent Sandy V. Lee is disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. *See* D.C. Bar. R. XI, § 14 (f). Respondent shall not be eligible for reinstatement for five years from the effective date of disbarment, pursuant to D.C. Bar R. XI, § 16 (a). Respondent's attention is called to D.C. Bar R. XI, § 14, including the affidavit requirement of subsection (g), and to the consequences of not timely complying with the requirements of section 14 set forth in D.C. Bar R. XI, § 16 (c). For the purposes of reinstatement to the bar, respondent's disbarment shall commence on the date he files a sufficient affidavit pursuant to D.C. Bar R. XI, § 14 (g).

*So ordered.*