**In re John E. ANDERSON, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 420236).**

**No. 07–BG–799.**

District of Columbia Court of Appeals.

Submitted Aug. 18, 2009.

Decided Sept. 3, 2009.

---

Before REID and KRAMER, Associate Judges, and FARRELL, Senior Judge.

PER CURIAM:

The Board on Professional Responsibility recommends disbarment of respondent for his cumulative conduct over more than ten years evincing (in Bar Counsel's summation) "non-negligent misappropriation and dishonesty, ... [and] failure [a] to promptly deliver funds belonging to another, ... [b] to deposit entrusted funds in a proper account, ... [c] to maintain complete records of the funds for the required amount of time, ... [d] to adequately protect [one] client['s] ... interests by intentionally failing to pursue her objectives or to act with reasonable promptness, and ... [e] to comport himself properly before the disciplinary system" (Br. for Bar Counsel at 22).

We accept the Board's recommendation, supported by the comprehensive and cogent reasoning set forth in its report, which we adopt and append hereto. Fundamentally, the report demonstrates "a pattern or course of conduct [by respondent manifesting] an unacceptable disregard for the welfare of entrusted funds," *In re Anderson*, 778 A.2d 330, 339 (D.C. 2001) (*Anderson I* ), in that he

> made it a practice not to pay ... medical providers but [rather] to use the funds that should have been paid to them for other purposes until and unless pursued and caught by the medical providers. In [the present] case, he kept and used the funds for his own purposes

for at least five years, while repeatedly falsely reassuring the client that he had satisfied the medical providers and that she should not concern herself with their claims.

See *post*, at [1222–23].

Accordingly, respondent is hereby disbarred from the practice of law in the District of Columbia. For purposes of reinstatement, the period of disbarment shall begin following his compliance with the requirements of D.C. Bar R. XI, § 14. *See id.* § 16(c). Reinstatement shall also be conditioned upon respondent's fulfillment of the restitution obligation recommended by the Board.

*So ordered.*

## REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

This is the third case in the last seven years brought against Respondent for misappropriation during the 1990's resulting from keeping for his own use or his clients' use personal injury settlement funds that belonged to medical providers or to his clients. Although the basic activities in this matter occurred before Respondent was suspended for six months by the D.C. Court of Appeals (in August 2001) for the first matter brought against him by Bar Counsel, *In re Anderson*, 778 A.2d 330 (D.C.2001) (hereafter, "*Anderson I* "), critical actions by the Respondent in this matter, after the suspension, reveal that Respondent still lacks an appreciation of his responsibilities to protect his clients' interests in settlement funds and to deliver promptly to creditors of the clients monies that had been designated for them.

Disbelieving Respondent's explanations—because of both his dissembling demeanor at an evidentiary hearing and the implausibility of his story—Hearing Com-

mittee No. Six unanimously recommended Respondent's disbarment for what it found to be at least reckless misappropriation. The Hearing Committee concluded that Respondent's failure to pay the medical providers from the 1996 settlement ripened into at least reckless misappropriation by 2001 when Respondent falsely reassured his client that he had paid the outstanding bills from the settlement proceeds even though he had no records to substantiate those claims, made no effort to locate such records and took no actions with the creditors to satisfy these long overdue claims. Viewing this record in the light of the two previous similar cases against Respondent and examining the "entire mosaic" presented of Respondent's approach to settlement funds,[1] as we were urged to do by the Court of Appeals in its recent decision in *In re Ukwu,* 926 A.2d 1106 (D.C.2007), the Board concludes that the misappropriation was at least reckless from the outset and compounded by dishonest conduct around the time of his suspension and recommends disbarment.

The Hearing Committee found that Bar Counsel had proved all of its charges by clear and convincing evidence. Those charges were violations of the D.C. Rules of Professional Conduct, 1.3(b) (failure to pursue client's objectives), 1.3(c) (failure to act with reasonable promptness), 1.15(a) (misappropriation, failure to maintain financial records), 1.15(b) (failure to deliver funds promptly), 1.17(a) (failure to deposit trust funds in properly denominated account), 8.4(c) (dishonesty), 8.4(d) (serious interference with administration of justice), and D.C. Bar R. XI, § 19(f) (failure to keep proper escrow records). The Board similarly concludes that each of the violations has been established by clear and convincing evidence and that disbarment is required under *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc) because the misappropriation was at least reckless.

We adopt below the Hearing Committee's well supported findings of fact, with minor modifications, but reach our own legal conclusions and characterizations of these findings, although they lead to the same ultimate recommendation.

## FINDINGS OF FACT

### I. Background

1. Respondent is a member of the District of Columbia Bar, having been admitted on September 22, 1989 and assigned Bar Number 420236. Tr. 211; BX A.[2]

2. On July 17, 1995, Robin Fisher–Hammond and her minor son were injured in an automobile accident in Maryland. Tr. 43, 102; BX 7 at 1, 4. Ms. Fisher–Hammond was transported by ambulance to Laurel Regional Hospital in Laurel, Maryland on the same day and treated there for her injuries. Tr. 44; BX 7 at 1. The bill for her treatment was $397.12. BX 2.

---

1. This mosaic would have appeared more promptly and more clearly to the Board if the charges in this case had been combined with the charges in the second *Anderson* case (No. 224–98), which was heard by a Hearing Committee in January 2005. As we understand the record, such consolidation was readily feasible. Particularly where the Court had advised in *Anderson I* (778 A.2d 330, 339) that "recklessness" can be shown by "a pattern or course of conduct demonstrating an unacceptable disregard for the welfare of entrusted funds," it would have been beneficial to the Board and resource-efficient, if these matters had been consolidated. We understand that the Office of Bar Counsel will undertake to effect such consolidations, where feasible, in the future.

2. Bar Counsel's Exhibits are indicated in this Report and Recommendation as "BX ——", and Respondent's exhibits are indicated as "RX ——". The transcript of the merits hearing on violations and sanction held on February 28, 2006 is indicated as "Tr. ——".

Ms. Fisher–Hammond's son also received treatment at Laurel Regional Hospital. Tr. 46. Ms. Fisher–Hammond received follow-up medical treatment for approximately eight months after the accident from Dr. William J. Launder of Maryland Orthopedics. Tr. 48–51; BX 1, 7 at 2.

3. The day after the accident, Ms. Fisher–Hammond engaged Respondent to pursue her claim against the driver who had struck her automobile. Tr. 44–49. Ms. Fisher–Hammond does not recall receiving or signing an engagement agreement with Respondent, and no such agreement appears in Respondent's file as submitted to Bar Counsel. Tr. 45–46; BX 7 (materials provided by Respondent to Bar Counsel).[3] She did recall signing an engagement agreement in an earlier case in which Respondent had acted for her. Tr. 47. Respondent settled Ms. Fisher–Hammond's son's case and disbursed the proceeds; those funds are not at issue in this matter.

## II. *The Misappropriation*

A. *Deposit, Disbursement and Withholding of Settlement Proceeds*

4. Ms. Fisher–Hammond's case settled in or about April 1996. Pursuant to the settlement, the Maryland Automobile Insurance Fund ("MAIF") issued a check (No. C25283) dated April 12, 1996 to "Robin Hammond and John Anderson, Attorney" in the amount of $14,338.37. Tr. 225, 313–315; BX 3, 7 at 2.

5. On or about April 19, 1996, Respondent deposited the MAIF check into an account denominated "John Anderson & Associates" and numbered 6670178125 at Signet Bank (now Wachovia Bank, Tr. 17, 20–21). Tr. 25, 27–28; BX 4 at 1. Ms. Fisher–Hammond does not recall endorsing or even seeing the MAIF check. Tr. 53–54. *But cf.* Tr. 313–315 (Respondent's claim that he presented check to client for her co-endorsement). Respondent's bank account did not contain the words "trust" or "escrow" in its title. Tr. 22; BX 4–6.

6. On or about May 10, 1996, Respondent met Ms. Fisher–Hammond at her home and provided her with a check in the amount of $7,802.00 drawn on the "John Anderson & Associates" account at Signet Bank. Tr. 54–55, 226; BX 5 at 11, 11 A; BX 7 at 2. Respondent also presented and asked Ms. Fisher–Hammond to sign a disbursement sheet. Tr. 56, 224–225; BX 1. The disbursement sheet is undated and contains the following entries:

SETTLEMENT STATEMENT

Robin Hammond v. Anna Luckett

Amount of Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$14,338.37

Rental Expenses Recovered (included in the above sum) . . . . . . . . . . . . . . . . . . . . .$ 1,500.00
(No Atty Fee charged on this amount)

Attorney Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 4,279.00
(Atty Fee charged on $12,838.37 only)

---

**3.** Respondent did submit an engagement agreement for his representation of Ms. Fisher–Hammond's son. The document, dated July 20, 1995, is entitled "Contract for Legal Services—Contingency Fee Agreement" and bears what appears to be Ms. Fisher–Hammond's signature over the handwritten notation "on behalf of my minor son Andre Hammond," Tr. 221–224, 336–339; RX 1.

Misc. Expenses .................................................$ 100.00
(records fee to Hospital; phone calls to both insurance companies long dist.;
pictures; postage; faxes; courier; trips to dealership)

Dr. Launder......................................................$ 1,800.00
(reduced from $2,490.12 balance)

P.G. Radiodiagnostic (reduced from $173.00) .............................$ 133.00

P.G. Hospital ...................................................$ 397.12

Capital Emergency Associates ........................................$ 120.00

Total Medicals .................................................$ 2,450.12

PIP Benefits to A. Hammond ........................................$ 292.75

Total to Ms. Hammond ...........................................$ 7,802.00

*Robin Hammond*
Ms. Robin Hammond

Thank-you for using my office!!

Tr. 56, 224–225; BX 1 (italicized text indicates Ms. Fisher–Hammond's signature).

7. Respondent indicated to Ms. Fisher–Hammond at the May 10 meeting that he would pay her medical providers using the $2,450.12 he had withheld from the settlement proceeds for that purpose. Tr. 58–60, 242; BX 1. The medical providers included Maryland Orthopedics, P.G. Radiodiagnostic, Capital Emergency Associates, and Laurel Regional Hospital (indicated on the disbursement sheet as "P.G. Hospital"). BX 1. As reflected on the disbursement sheet, Respondent represented that two of these providers, Maryland Orthopedics and P.G. Radiodiagnostic, had already agreed to reduce their bills. Tr. 57; BX 1.

8. As a consequence of her May 10, 1996 meeting with Respondent, Ms. Fisher–Hammond assumed that the medical providers would be paid with the withheld settlement proceeds and gave no further thought to their payment for some years thereafter. Tr. 59–61.

B. *Payments to Medical Providers*

9. Respondent appears to have paid one of Ms. Fisher–Hammond's medical providers, Capital Emergency Services, albeit less than the invoiced amount. The Signet Bank account was debited on May 17, 1996 for check 1053 in the amount of $96.00. Tr. 31–32; BX 5 at 1. Although the microfiche copy of the check is largely illegible, the words "CAPITAL EMERGENCY" are clearly visible on the back side of the check. Tr. 31, 34–36, 228–229; BX 5 at 16a. A payment of $96.00 would reflect a 20% discount of the initial invoice amount of $120.00. Such a discount would be consistent with Respondent's practice of "compromising" or negotiating reductions of his clients' medical bills after settlement. We note in this regard that Respondent appears to have sought a 20% reduction of the Laurel Regional Hospital bill as well, though apparently without success. Tr. 302–303; BX 7 at 25, 83; RX 2. There is no documentation, however, establishing that Capital Emergency Associates actually agreed to the reduction as opposed to simply cashing the check and

failing to pursue the balance on account of the small amount of money involved. It is also curious that the Capital Emergency Associates check was cashed on the same day as Ms. Fisher–Hammond's disbursement check, yet the 20% reduction is not reflected on the disbursement sheet Respondent provided to Ms. Fisher–Hammond with her check.

10. The May and June 1996 statements for the "John Anderson & Associates" account at Signet Bank do not reflect any payments to Maryland Orthopedics, Laurel Regional Hospital, or P.G. Radiodiagnostic. Tr. 31–32; BX 4–6. There is no evidence to corroborate Respondent's claim that he paid Maryland Orthopedics in 1996. Tr. 136–137. He has not remitted the amount of the reduction (presumably the $1,800.00 he withheld for this purpose minus $1,250.00, or $550.00) to Ms. Fisher–Hammond, although these funds belong to her. Tr. 77–78. Respondent was not able to produce any documentation of having paid Maryland Orthopedics prior to the February 14, 2006 settlement, of having paid the $397.00 invoice from Laurel Regional Hospital, or of having paid the $173.00 invoice from P.G. Radiodiagnostic. BX 7; *see also* BX 4–6.

C. *Unauthorized Use of Settlement Proceeds*

11. Although the May and June Signet Bank account statements fail to show payments to three of the four medical providers, they clearly reflect the impermissible depletion of withheld settlement funds from the account. Checks 1061 and 1062 cleared on June 21, 1996, bringing the account balance to $670.20, well below the $2,330.12 (i.e., the $2,450.12 withheld minus the discharged $120.00 obligation to Capital Emergency Associates) Respondent was required to hold in trust to pay Ms. Fisher–Hammond's medical providers, plus the $24 he owed to Ms. Fisher–Hammond on account of the reduction of the Capital Emergency Associates payment.[4] Tr. 29–32; BX 6 at 1; *But cf.* Tr. 39–40 (evidence does not foreclose possibility that smaller invoices from P.G. Radiodiagnostic and Laurel Regional Hospital were paid after June 24, 1996 from remaining $670.20 of withheld settlement proceeds).

12. The disbursements leading to this shortfall were clearly for Respondent's own purposes rather than Ms. Fisher–Hammond's, with a number of checks made out to "Cash" or to third parties with no apparent relation to the case. BX 5, 6. By Respondent's own admission, the two checks (1061 and 1062) that immediately precipitated the shortfall pertain to anoth-

4. This assumes that Respondent's claim to have negotiated reductions of the Maryland Orthopedics and P.G. Radiodiagnostic invoices is true. *See* Tr. 124–127, 162–164, 173–176, 204–209 (no reduction according to Maryland Orthopedics). If these obligations were not renegotiated, the amount required to meet them prior to resolution of the Capital Emergency bill would have been $3,060.24 rather than $2,450.12. On the other hand, because Respondent withheld funds from his client based on the reduced figures on the disbursement sheet, he would effectively have under-withheld (i.e., paid too much to the client) if the reductions with those medical providers had not actually been agreed. With respect to the other two providers, Capital Emergency and Laurel Hospital, Respondent withheld funds based on the full invoice amounts and therefore over-withheld (i.e., underpaid his client) if in fact he negotiated reductions of these debts. The amount of any reductions of these two invoices (including the $24 reduction of the Capital Emergency bill) belongs to Ms. Fisher–Hammond and should have been paid to her. Similarly, the further reduction of the Maryland Orthopedics bill, from $1,800.00 to $1,250.00 resulted in a windfall to which Respondent had no claim of ownership. These funds should have been paid promptly to Ms. Fisher–Hammond.

er case. Tr. 239–242. Check 1061 is payable to an Antoine Thompson for "Settlement" in the amount of $900. BX 11–12. Check 1062 is made out to "Cash" in the amount of $1,600.00, with the notation "Thompson–Reduced Fee" in the "Memo" section. BX 6 at 13–14; *see also* Tr. 239–241 (Respondent's statement that $1,600.00 was fee relating to another case).

13. Ms. Fisher–Hammond had not authorized Respondent to use the funds for any purpose other than paying her medical providers. Tr. 59–61.[5]

14. Respondent concedes that these transactions resulted in a misappropriation of funds, Resp. Post–Hrg. Br. 7 ("There is no dispute that Respondent misappropriated funds ...."), and the Committee found and the Board affirms that Bar Counsel has established misappropriation by clear and convincing evidence.

15. In parts of his testimony, Respondent was adamant that he had actually paid Ms. Fisher–Hammond's medical providers. Tr. 238 ("I remember writing these checks."), 239 ("I wrote those checks. I know I wrote them."), 241 ("At the time I wrote [the check that depleted the withheld funds], I had paid Ms. Hammond's providers."). In other parts of his testimony he appears to concede that that he might be mistaken in this regard or contends that clerical error may be at fault. Tr. 237–241, 281. He acknowledged that his bookkeeping practices were seriously inadequate, Tr. 242 ("Well, I didn't really have a real bookkeeping system, because,

one, I was really trying to do sports and entertainment."), and that he did not maintain any written record of his receipts and expenditures in respect of entrusted funds, Tr. 243 ("So I was sort of more or less—I was tracking these in my head.").

16. The Committee found and the Board affirms that Respondent did not pay Maryland Orthopedics until his settlement of their invoice on February 14, 2006, two weeks prior to the evidentiary hearing in this matter, RX 4 at 2 (debt settled for $1,250.00, or roughly 50%), and has not paid Laurel Regional Hospital at all.[6] Respondent acknowledges that he failed to record any such payment, Tr. 282; could not identify the check number for any such payment, Tr. 281–283; could not produce a cancelled check reflecting such a payment, Tr. 281–283, 323–324, 338–340; and failed to maintain sufficient funds in the account to cover the payments if he had made them, Tr. 320–322. Although Respondent contends that "the [Signet Bank] account was never in overdraft," Resp. Post–Hrg. Br. 13, it clearly would have been in overdraft if Respondent, having made the payments discussed above through checks 1061 and 1062, had also made the required payments to Ms. Fisher–Hammond's medical providers.

### D. *Harm to Client*

17. At the time Respondent failed to pay her medical bills, Ms. Fisher–Hammond's financial situation could only be described as precarious. A recently separated mother of two, she was working as a

---

5. It appears that Ms. Fisher–Hammond executed an "Authorization and Assignment" form provided by Maryland Orthopedics, that Maryland Orthopedics forwarded the form to Respondent for his signature, and that Respondent did not return a signed copy of the form as requested. Tr. 103–109, 145; BX 7 at 26, 20.

6. Respondent also claims to have paid P.G. Radiodiagnostic $133.00 as an agreed reduction of that company's $173.00 invoice, Resp. Post–Hrg. Br. 5, but he has offered nothing to substantiate that claim. In view of the course of conduct, we very much doubt that this payment was made, but the issue is not critical to our analysis and need not be resolved.

clerk in a warehouse packing shipments for $7 per hour to support herself and her children. Tr. 42–43, 66, 68. Respondent was well aware of Ms. Fisher–Hammond's very limited means, having been told by her that she could not afford to stay away from work for long despite her injuries (and having met with her after hours at her home for this reason), and having recently made submissions relating to lost wages on her behalf. Tr. 67–69; BX 7 at 5, 7. It was foreseeable that failing to meet these debt obligations would place Ms. Fisher–Hammond in a position of inability to pay her bills and thus damage her credit and subject her to pursuit by collections agencies. Tr. 66–68; *see also* Tr. 190–191 ("Authorization and Assignment" to Maryland Orthopedics leaves client "on the hook" in event of nonpayment). The Hearing Committee did not find Respondent's claim of unawareness of Ms. Fisher–Hammond's financial condition to be credible and specifically declined to credit that testimony. Tr. 311–312 ("I would really not know anything about her personal finances.").

## III. *Discovery of the Nonpayments*

18. What notice Respondent had of the outstanding payment obligations in the period June 1996 to March 2001 remains unclear. The representative of Maryland Orthopedics testified in a manner that the Hearing Committee found credible that Respondent would have received an invoice with each of the numerous treatment notes sent to him while Ms. Fisher–Hammond was in Dr. Launder's care and would have received monthly invoices after the termination of treatment. Tr. 180–182. Respondent avers that he received no indication of outstanding balances from any of the medical providers or from his client.

Tr. 245; BX 7 at 2 ("I have received no correspondence or calls from the medical providers in her case and believe they were paid.").

19. After more than four years, in or around August 2000, Ms. Fisher–Hammond received a telephone call from Maryland Orthopedics indicating that her bill had not been paid.[7] Tr. at 61–63; BX 9A at 9; *cf.* Tr. 135 ("She contacted our office."). Maryland Orthopedics also informed Ms. Fisher–Hammond that Respondent had not obtained a reduction of her bill to $1,800.00 as he had claimed and that she remained responsible for paying the full amount of $2,495.90. Tr. 61–63, 135. Ms. Fisher–Hammond subsequently received a letter from a collection agency (dated Dec. 2, 2000) indicating that it had received the account by referral from Maryland Orthopedics and that her obligation, with collection charges, was $3,244.67. Tr. 71–72, 135–36; BX 2 at 2.

20. At some point after learning of the nonpayment of the Maryland Orthopedics invoice, Ms. Fisher–Hammond obtained a copy of her credit report from Equifax Credit Information Services, a credit reporting agency. Tr. 63–64; BX 2 at 1. The report indicates that both Maryland Orthopedics and Laurel Regional Hospital had reported her bills to the agency as having never been paid. Tr. 63–64; BX 2 at 1.

21. After learning of the nonpayments, Ms. Fisher–Hammond attempted to contact Respondent but found that the home and office telephone numbers she had for him were no longer good. Tr. 66; BX 9A at 9. She made efforts to find contact information for him through the telephone directory, via internet research, and by contacting her friend through whom she

---

7. Ms. Fisher–Hammond had moved in the interim and assumed that this impaired the ability of Maryland Orthopedics to reach her about the unpaid invoice. Tr. 62.

had initially met Respondent—all to no avail. Tr. at 66, 69–70.

## IV. Respondent's 2001 Contact with Bar Counsel and Ms. Fisher–Hammond

22. It was not until after Respondent received an inquiry from Bar Counsel in early 2001 (see below) that Ms. Fisher–Hammond heard from him. Tr. 75–77, 83–98, 245–250. This contact appears to have occurred in or around April 2001. Tr. 75–76, 96, 245–246; BX 8 at 2. Respondent expressed surprise regarding the allegations of unpaid bills, assured Ms. Fisher–Hammond that he had paid them, and promised to look into the matter. Tr. 77, 83–84, 90–93, 246–247. He indicated that relevant files had been damaged or destroyed by a fire while in storage. Tr. 91–93. *But see* Tr. 213–214 (Respondent's testimony that files were unavailable on account of burglary of offices); BX 7 at 2–3 (office broken into "on several occasions"); BX 10 (representing to Board that files may be unavailable because of a "robbery/theft"). He requested that Ms. Fisher–Hammond fax the Maryland Orthopedics bill to him at a fax number he provided. Tr. 85. When she attempted to do so either the same day or the following day, she found that the fax and telephone numbers he had provided her were inoperable. Tr. 85. *But cf.* Tr. 247 ("I gave her a good fax number did not. . . . I don't know why it didn't come."). Ms. Fisher–Hammond did not hear from Respondent again, although she remained at the same residence for approximately one year thereafter. Tr. 94–96.

23. Respondent contends that he attempted shortly after his discussion with Ms. Fisher–Hammond to contact Maryland Orthopedics and Laurel Regional Hospital to inquire about their outstanding bills. Tr. 247–249. He averred that his efforts to determine the status of the invoices were unsuccessful with both providers, who left him on hold or failed to return his calls, and he therefore assumed the bills had been paid and gave up on his inquiries. Tr. 249; *see also* Tr. 250 ("So I presumed, yes, I was correct that I had paid these things, because, if I hadn't paid these things, I knew I would hear something. . . . But I didn't hear anything."). Respondent made no effort to obtain statements or other records from Signet Bank in order to determine whether the payments had in fact been made. Tr. 281–283, 323–324, 338–340.

## V. Disciplinary Inquiries and Proceedings

### A. Respondent's Tardy Response to the Bar Complaint

24. As indicated above, Ms. Fisher–Hammond filed a bar complaint against Respondent in early 2001. The complaint was docketed on February 6, 2001. Tr. 74; BX 8. In connection with her complaint, Ms. Fisher–Hammond provided Bar Counsel with the disbursement sheet Respondent had provided her (with her handwritten annotations), the Equifax credit report, the collection agency's letter, and a bill sent by Maryland Orthopedics in 2000 at her request (Tr. 62). BX 8 at 2–10.

25. Bar Counsel mailed a letter to Respondent on February 12, 2001 enclosing the complaint materials from Ms. Fisher–Hammond and requesting a written response to the complaint by February 22, 2001. BX 8, 9A. Bar Counsel requested that Respondent provide, *inter alia,* his office file, including any records reflecting the deposit and disbursement of the settlement proceeds and any records memorializing or reflecting the basis for his fee. *Id.* Bar Counsel addressed the letter to 2620 28th St. N.E., Washington, D.C. 20018–1415, one of two addresses Respondent

had registered with the D.C. Bar as his address of record. BX 9A. No response was received from Respondent, and Bar Counsel's letter was not returned. BX 9 at 1.

26. Also on February 12, 2001, Bar Counsel arranged to serve Respondent personally with the complaint both at the 28th Street address and at the other address Respondent had listed with the D.C. Bar, 1730 K Street N.W., Suite 304, Washington, DC 20006–3839. BX 9B, 9C. Bar Counsel's personal service attempts were unsuccessful at both addresses. BX 9B, 9C.

27. On March 15, 2001, Bar Counsel wrote to Respondent by first-class mail at the K Street address, notifying him that the due date for his response had expired and that he was required to submit a written response to the inquiry within five days. BX 9 D.

28. On March 20, 2001, Bar Counsel received a facsimile transmission from Respondent in which he acknowledged receipt of Bar Counsel's letter dated March 15, 2001. BX 9E; RX 3. Respondent requested a 30–day extension of the deadline to allow him "to locate the file and answer." BX 9E; RX 3.

29. On March 23, 2001, Bar Counsel wrote to Respondent by regular mail granting his request for a 30–day extension, to April 19, 2001. BX 9F. Respondent did not respond within that time frame. BX 9 at 2.

30. On May 1, 2001, Bar Counsel filed a motion to compel Respondent's substantive response to her inquiry with the Board on Professional Responsibility (the "Board"). BX 9.

31. On May 13, 2001, Respondent filed an opposition to Bar Counsel's motion, using the same K Street address to which Bar Counsel's earlier, unanswered correspondence had been directed. BX 9B, 9C, 10. In his opposition, Respondent stated that he had "received no notice until now of any disciplinary complaint" and contended that he "has no affirmative duty to make himself available to be served in a matter of which he has no knowledge." BX 10 at 1. These statements to the Board were misleading in view of Respondent's having received and responded to Bar Counsel's March 15, 2001 letter and having discussed the bar complaint with his client in April 2001.[8] Respondent made reference in his submission to a "robbery/theft which occurred in his office some years ago" and stated that the relevant files "may not be available for that reason." *Id.* at 1–2. (As noted above, Respondent had indicated to Ms. Fisher–Hammond that her file might not be available on account of a fire.) Respondent requested a second 30–day extension from the Board, until June 12, 2001, within which to respond to Bar Counsel's inquiries. Respondent thereafter failed to provide a response within the 30 days. BX 11 at 4.

32. Bar Counsel filed a reply on May 21, 2001, disputing a number of the factual and legal contentions adduced by Respondent in his opposition. BX 11. The reply was mailed to Respondent at the K Street address. *Id.* at 6.

33. On July 30, 2001, the Board ordered Respondent to provide a substantive response to Bar Counsel's inquiries within 10 days. BX 12.

34. On August 2, 2001, the Court of Appeals issued its decision (*"Anderson I "*) suspending Respondent for six months as

---

8. Incongruously, Respondent acknowledged in his submission having learned of the bar complaint earlier and having requested an extension of time in which to respond. BX 10 at 1.

a result of a misappropriation that occurred in connection with an unrelated settlement of a case for a different client in 1993. In that case, Respondent claimed that he had simply forgotten to pay the medical providers because of confusion with respect to yet another unrelated settlement.

### B. *Respondent's Substantive Answer*

35. By letter dated August 10, 2001, Respondent provided a substantive written response to Ms. Fisher–Hammond's disciplinary complaint contending that he had paid Ms. Fisher–Hammond's medical bills and had closed the file. BX 7. More specifically, he stated that

I received a check in the amount of ($14,338.37) ... From the proceeds an attorney's fee of one third of the bodily injury amount received was charged [sic] and the remainder paid for medical expenses and medical expenses [sic]. The total owed to Maryland Orthopedics was compromised by the amounts paid by Ms. Hammond's automobile carrier and then further reduced by negotiation. The balance totaling [$7,802.00] was paid to Ms. Hammond. Thereafter I spoke to each provider regarding their expenses and arrived at the amount owed. Checks were issued and the file closed thereafter. I have received no correspondence or calls from the medical providers in her case and believe that they were paid. During the period I had assistance in my office by way of a clerical person who did not advise me that any calls or inquiries were made in regards to payment on this file from any source. My office was broken into on several occasions and eventually the building was sold requiring me to move to a new location. I transferred my phone line there for a period in excess of one year. At no time did I receive a call from Dr. Launder or Ms. Hammond in regards to non-payment of any medical bills resulting from treatment in this case. I did not receive additional billing during this period.

BX 7 at 2.

36. Respondent enclosed with his substantive response "the contents of [his] file." Tr. 264. Although Bar Counsel had requested that Respondent provide all records reflecting deposit and disbursement of the settlement proceeds and/or showing the basis for his fee, no such records appeared in Respondent's submission. BX 7. Specifically absent from the submission were (i) an engagement agreement between himself and Ms. Fisher–Hammond, (ii) the settlement disbursement sheet, (iii) bank records reflecting the deposit and disbursement of the funds in question, and (iv) any documentation of the payments he claimed to have made to the medical providers. *Id.* The only financial record Respondent produced was a copy of the face of the $14,338.37 settlement check drawn to the order of Ms. Fisher–Hammond and Respondent. BX 7 at 16.

### C. *The Specification of Charges*

37. Almost four years later, and approximately nine years after the disbursements in question, Bar Counsel issued a Specification of Charges and a Petition Instituting Formal Disciplinary Proceedings against Respondent. BX B (issued June 9, 2005). Bar Counsel made numerous attempts to serve these charging documents upon Respondent, and the process servers left multiple messages at his office requesting response, all to no avail. BX 16. Bar Counsel obtained an order authorizing service by alternative means from the Court of Appeals on October 28, 2005 and published notices on November 2 and 3, 2005. BX 17–19. Bar Counsel obtained proof of personal service of the Specifica-

tion and Petition on November 2, 2005. BX D.

### D. *The Hearing Committee's Proceedings*

38. Respondent's Answer was received on November 21, 2005.

39. A pre-hearing conference was held on January 20, 2006.

40. A hearing on the merits was held on February 28, 2006. The Committee heard evidence on the violations charged by Bar Counsel and, after retiring into executive session, found *prima facie* evidence of violations of the D.C. Rules of Professional Conduct. Tr. 422. Bar Exhibits A–D, 1–12, and 20 were admitted into evidence, Tr. 148, and Bar Exhibit 21 was marked for identification only, Tr. 139–150.

41. Upon resumption of the hearing, Bar Counsel submitted seven exhibits in aggravation, some over the objection of Respondent. BX 13–19. These exhibits were admitted into evidence, to be given the weight they deserve. Tr. 436. Respondent offered no exhibits in mitigation. Bar Exhibit 21 was not offered into evidence. Bar Exhibit 22 was offered and admitted into evidence. Tr. 402–406.

42. Respondent neglected to move his four exhibits into evidence at the hearing and sought leave by motion after the hearing to do so. The motion was not opposed by Bar Counsel, and the exhibits were admitted into evidence. The parties both submitted post-hearing briefs.

43. The Hearing Committee issued its unanimous Report and Recommendation on January 24, 2007 finding that all of the charges were proven by clear and convincing evidence and recommending disbarment.

### E. *The Board Proceedings*

44. After receiving extensions of time and obtaining substitute counsel, Respondent filed his exceptions to the Report and Recommendation of the Hearing Committee on April 27, 2007. Respondent's brief admits the misappropriation but claims it resulted from record-keeping negligence and was not reckless or intentional and urges a six month suspension in lieu of disbarment.

45. Bar Counsel filed an opposing brief on May 11, 2007, urging that the Board affirm the recommendation of the Hearing Committee and recommend to the Court that Respondent be disbarred for non-negligent misappropriation and dishonesty. Bar Counsel urged the Board to take into account all of Respondent's prior disciplinary history for purposes of recommending an appropriate sanction.

46. On May 24, 2007, oral argument was presented to the Board and the matter was submitted.

### *LEGAL ANALYSIS*

#### I. *Misappropriation*

██ ██ Rule 1.15(b) of the D.C. Rules of Professional Conduct provides that "a lawyer shall promptly deliver to the client or third person any funds ... that the client or third person is entitled to receive" and Rule 1.15(a) provides that the lawyer should hold such funds "separate from the lawyer's own property." Use of entrusted funds for the attorney's own purposes constitutes prohibited misappropriation under Rule 1.15. *See In re Utley,* 698 A.2d 446, 449 (D.C.1997) (holding that misappropriation includes any "unauthorized temporary use for the lawyer's own purpose, whether or not [the lawyer] derives any personal gain or benefit therefrom."). Keeping in his bank account and using for his own purposes the more than $2,300 that was

earmarked for the medical providers and owed to them under the client's authorization and assignment and deducted from the amount of the settlement due to the client constituted misappropriation. Other misappropriation occurred when Respondent paid less than the required amounts to the medical providers and did not remit the amount of the savings to the client. Respondent has conceded that he misappropriated funds in this matter, (Resp. Post–Hrg. Brief, p. 7, "[t]here is no dispute that Respondent misappropriated funds ...". Thus, there can be no doubt that Bar Counsel has proven misappropriation by clear and convincing evidence.

The critical question is whether Respondent's conduct in this matter is properly characterized as "merely" negligent or whether it was reckless or intentional, which requires disbarment in most cases. *See Anderson I,* 778 A.2d at 342; *Addams,* 579 A.2d at 191. To make this assessment, as directed in *Ukwu, supra,* the Board views the well supported factual findings in this matter in the light of the remarkably similar events that occurred in the same time frame and that resulted in earlier discipline against Respondent.

In *Anderson I,* 778 A.2d 330, *supra,* the case that resulted in Respondent's six-month suspension, Respondent misappropriated for his own use personal injury settlement proceeds that were owed to Drs. Phillips and Green, who treated his client, Mark Calligan, in the early 1990's. In that case, in March 1993, Respondent provided his client with a settlement disbursement statement, reflecting that approximately $1,200 would be paid to the doctors for the medical bills and deducting that amount (as well as others, including the payment to Respondent of his legal fees) from the amount provided to the client. Respondent provided the client his reduced share, but made no payment to

the doctors for approximately a year. During that time, the amounts in Respondent's bank account, which was not denominated as a trust or client account, dipped below the amounts needed to pay the doctors. Upon being pressed to pay the doctors' fees a year later, Respondent ultimately paid the medical providers in full.

In *Anderson II,* Bar Docket No. 224–98 (BPR July 21, 2006), a Board decision, the Board imposed a reprimand for Respondent's failing to notify and promptly pay a medical provider from the proceeds of a personal injury settlement in 1997. In that case, unlike the instant case and *Anderson I,* the client was aware that Respondent was not providing to her doctors the payment of the settlement to which they were entitled. The Hearing Committee and the Board accepted Respondent's explanation that the failure to pay the provider was done at the initiative of the client for the client's benefit on the belief that the insurers would satisfy the medical providers' bill. While in that case Respondent did not keep the proceeds for his own use, the similarity to the instant matter is that Respondent did not pay the medical providers with a portion of the proceeds of the settlement to which they were entitled under an authorization and assignment. In that case, the Board issued a reprimand, under the circumstances there presented. Among those circumstances was the fact that all of the conduct at issue occurred prior to Respondent's six-month suspension in 2001 for the events in *Anderson I* and little deterrent effect could be perceived for a new suspension upon Respondent's reinstatement for conduct that had occurred exclusively prior to the suspension and that was deemed less prejudicial to the client than the conduct for which Respondent had already served a suspension.

The instant case—representing the third matter in which settlement proceeds were misappropriated from the medical providers—spans both a time before and after the suspension and was the most prejudicial to the client. The settlement occurred in May 1996 when Respondent falsely represented to the client that he would imminently pay the third party medical providers and deducted those amounts from her share of the settlement. In addition, for more than four years after his suspension as a result of *Anderson I,* Respondent led the client in this matter to believe that he was taking care of the situation when in fact he did nothing to remedy his earlier default and only compounded the harm to the client.

We view the earlier two litigated proceedings not only as bearing on the appropriate sanction but also as helping to provide a correct legal characterization for the findings. Under the circumstances, the Board concludes that the failure to pay the medical providers in 1996, as the Respondent represented to the client that he would do imminently, was not simply the result of carelessness or faulty record-keeping but was part of a deliberate pattern of conduct.

It is too much of a coincidence that in *Anderson I,* Respondent "forgot" to pay the medical providers; in *Anderson II,* he deliberately failed to pay the medical providers at the client's urging; and in this case, *Anderson III,* he mistakenly "believed" he had paid the medical providers when there is no corroborating evidence that he did so or even believed contemporaneously that he had done so. The pattern suggests that Respondent made it a practice not to pay the medical providers but to use the funds that should have been paid to them for other purposes until and unless pursued and caught by the medical providers. In this case, he kept and used

the funds for his own purposes for at least five years, while repeatedly falsely reassuring the client that he had satisfied the medical providers and that she should not concern herself with their claims.

With this background in mind, we note that by the time of the May 1996 settlement in this case, Respondent had already been alerted to problems stemming from the earlier misappropriation in *Anderson I.* According to his testimony in *Anderson I,* he took a course in escrow accounting in 1995 and, therefore, knew that he should not have placed entrusted funds in a non-trust bank account and should have established a written accounting system for the entrusted funds by May 1996 when the Fisher–Hammond case was settled. Further, Respondent was aware by then of the Bar Counsel investigation of *Anderson I* and had even written to Bar Counsel about that matter in March 1996. Thus, by May 1996, Respondent knew the correct policies and the consequences for failure to pay the medical providers promptly. That he failed to pay them under these circumstances—while assuring the client in May 1996 that he would promptly pay them—bespeaks more than mere negligence.

Thus, unlike the Hearing Committee, the Board concludes that the original misappropriation was more than negligent; it was at least reckless and probably intentional. The events that occurred in 1996 alone may have been sufficient for us to have recommended disbarment. However, we do not rely exclusively on the events of May 1996, when the original misappropriation occurred, but also rely on Respondent's actions in 2001 and thereafter when confronted with the client's report that the medical providers had not been paid. The Board believes that the Respondent's undisputed activities of 2001 and thereafter can be viewed as either a "ripening" into reckless misappropriation, as the Hearing

Committee concluded under the analysis of *Utley,* 698 A.2d at 449, or corroborating evidence that the original misappropriation was reckless or intentional.

In April 2001, when confronted with his client's report that the medical providers had not been paid, Respondent glibly assured her that the bills had been paid and that he would take care of matters. That he did not check his bank records at that time suggests at least recklessness; it may also indicate that he was well aware that the records would reveal that there were no such payments. As the Hearing Committee noted, it is difficult to see how Respondent could have been so confident as to assure his client in April 2001 that he had paid the medical providers in 1996 when his counsel in *Anderson I* argued before the Court on April 11, 2001 that Respondent's record-keeping system in the 1990's was a shambles and that as he testified in this proceeding he essentially kept track of these matters in his head. (Tr. 243). Further, his claim in his testimony before the Hearing Committee of efforts to contact the medical providers rings hollow, particularly in light of the well supported conclusions of the Hearing Committee that his testimony was wholly implausible and delivered with a demeanor deemed incredible. *See* Hearing Committee Report, pp. 35–37.

Respondent has absolutely no corroboration that he ever made any calls to the medical providers. If he were truly sincere in seeking to clear up any discrepancies between the records and claims of the medical providers and his "recollection" of events, he could have easily written to the medical providers to set forth his version of events, with whatever supporting documentation he may have had (of which he produced none in this record) and sought their explanation for continuing to seek payment of these amounts. It is undisput-ed that he made no written communication to the medical providers or their collection agencies. He also failed to reconnect with the client for more than four years, contrary to the implications in his assurances to her.

We note that most of his cavalier treatment of this matter, at a time when the prejudice to the client was compounding, occurred after the disciplinary process in *Anderson I* was well advanced. By the time Respondent was notified by Bar Counsel and had communicated with his client, Ms. Fisher–Hammond, the Board had already recommended his suspension for six months in *Anderson I* and Bar Counsel had filed its brief seeking disbarment. By August 2001, the Court had suspended him for six months for his unjustifiably delaying for approximately a year to satisfy the bills of his client, Mr. Calligan, in 1993. Thus, even though the seriousness of this matter and the precise ethical standards had been drawn to his attention by Bar Counsel, the Board and the Court, Respondent apparently did not see the need to correct the situation he had created in 1996 in this matter or to alleviate the dire circumstances his conduct had caused for his client, Ms. Fisher–Hammond. One would have suspected that a lawyer, suspended for this very practice, would have taken extraordinary steps at that time to remedy the situation so that the client was protected and so that, after the suspension had been served, any additional disciplinary proceeding would result in a mitigated sanction. Instead, Respondent gave false assurances, ignored the situation, and then attempted to evade responsibility by making misrepresentations to Bar Counsel and the Hearing Committee.

In short, the Board concludes that the misappropriation was at least reckless from the outset, was compounded by Re-

spondent's reckless activities when confronted with the situation he had created and attended by dishonesty to the client, Bar Counsel and the Hearing Committee.

## II. *Dishonesty*

 Under the D.C. Rules, it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." D.C. Rules of Prof'l Conduct R. 8.4(c). Like the Hearing Committee, the Board finds that Respondent engaged in dishonesty with his client throughout the settlement process of this matter. The settlement statement he presented to her contained misrepresentations when it claimed that amounts had been or would shortly be paid to her medical providers. It also apparently misrepresented that Respondent had negotiated reductions from the original bills of the medical providers, who testified credibly that they had had no such discussions and reached no such agreements with Respondent. Respondent also misrepresented to his client in 2001 that he had paid the bills. He also misrepresented when he claimed that he would look into the matter and at least implied that he would get back to the client. His unbelievable testimony at the Hearing underscores the dishonesty that attended his representations to the client about settlement matters prior to the hearing. Accordingly, we agree with the Hearing Committee that Bar Counsel has succeeded in establishing by clear and convincing evidence Respondent's dishonesty in this matter.

## III. *The Remaining Rule Violations*

We also accept and hereby adopt, with minor modifications, the Hearing Committee's conclusions that Bar Counsel successfully established by clear and convincing evidence all of the other violations charged.

### A. *Diligence and Promptness Related Violations*

 Rule 1.3(b) provides that a lawyer shall not intentionally "[f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules" or "[p]rejudice or damage a client during the course of the professional relationship." Respondent in this matter failed to seek the lawful objectives of Ms. Fisher–Hammond by failing to pay the medical providers and then later by failing to resolve the outstanding invoices of her medical providers as he had promised to do. He also damaged his client by harming her credit and subjecting her to demands for payment, with interest, from her creditors. Not only did he fail to pay in the first instance with the settlement proceeds, but when the issue was raised by Bar Counsel and the client in 2001, he failed to obtain his bank statements for the relevant period to determine whether he had actually paid the medical providers. Other steps, such as more diligent efforts to inquire of the providers, were also possible. "Neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it." *In re Lewis*, 689 A.2d 561, 564 (D.C.1997). The Board agrees with the Hearing Committee that this is an apt description of the view most favorable to Respondent of what transpired in this case.

The Rules also provide that "[a] lawyer shall act with reasonable promptness in representing a client," (R. 1.3(c)) and that "a lawyer shall promptly deliver to [a] client or third person any funds ... that the client or third person is entitled to receive...." R. 1.15(b). There can be no question on this record that Respondent failed to pay his client's medical providers

promptly. On a charitable view of Respondent's conduct, he became aware in 2001 of a serious risk of nonpayment of at least two and possibly four medical providers whom he had withheld funds to pay in 1996 and Respondent paid one of them, Maryland Orthopedics, only in 2006, on the eve of his disciplinary hearing. As of the date of the hearing in this matter, Respondent had not paid at least one of the other providers at all and had not returned any of the funds to his client. *See In re Ross*, 658 A.2d 209, 211 (D.C.1995) (eleven-month delay in paying third-party medical provider not prompt). This conduct violated these rules.

### B. *Record Keeping and Trust Accounting Violations*

■ Applicable disciplinary rules also provide that "complete records" of entrusted funds "shall be kept by the lawyer and shall be preserved for a period of five years after the termination of the representation" (R. 1.15(a)) and that such records shall also be preserved "for a period of five years after final distribution of such funds ... or any portion thereof." D.C. Bar R. X1, § 19(f). There can be no question that Respondent violated these requirements. His file, as produced to Bar Counsel in 2001, contained no account statements, cancelled checks, or other records demonstrating the required disbursements. He has not produced such records in more than five years since he received Bar Counsel's inquiry. And he has admitted not having such records and indeed not having had any written accounting system. *See, e.g.*, Tr. 282, 287.

Rule 1.17(a) requires that trust funds be segregated from a lawyer's own funds and "deposited in one or more specially designated accounts at a financial institution" and that "[t]he title of each such account shall contain the words 'Trust Account' or 'Escrow Account,' as well as the lawyer's or the lawyer's law firm's identity." The account into which Respondent deposited his client's settlement proceeds did not contain the words "Trust Account" or "Escrow Account" in its title as required by the Rule. Tr. 22 (bank representative's testimony that account is not trust account); BX 4, 5, 6 (account statements lacking necessary words in title). Even though he took a course on the subject in 1995, Respondent conceded that in 1996 the account was not denominated as a trust account, Pre–Hrg. Tr. 5–7 (Jan. 20, 2006), and the Rule has therefore clearly been violated.

### C. *Serious Interference with the Administration of Justice*

■ Rule 8.4(d) states that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice." The Board accepts the Hearing Committee's conclusion that Bar Counsel has proven this charge by clear and convincing evidence based on Respondent's unresponsiveness to the disciplinary inquiry and, more significantly, his effort to distract that inquiry once he did respond by providing uncorroborated and inaccurate assurances to Bar Counsel that Ms. Fisher–Hammond's medical providers had been paid when he was aware or should have been aware of a serious risk that these assurances could not be substantiated.[9] The Hearing Com-

9. The Hearing Committee Report stated: "Respondent's conduct and statements and the difficulties experienced in serving process upon him at his registered addresses raise a suspicion—but only that—of evasion of ser-

vice of Bar Counsel's initial inquiry letter and follow-up correspondence. We are especially troubled by Respondent's position before the Board that he 'has no affirmative duty to make himself available to be served in a mat-

mittee properly expressed its serious doubt concerning the genuineness of Respondent's alleged confidence in 2001 and afterward that these payments had been made. This suspicion also causes the Board to doubt Respondent's statements to Bar Counsel and his cooperation with the disciplinary investigation during this period.

Plainly, Respondent did not acquit himself admirably in dealing with Bar Counsel's inquiry. Respondent twice made undertakings in obtaining extensions of time which he then breached without explanation. Respondent's lack of responsiveness required issuance of an order by this Board compelling a substantive response to Bar Counsel's inquiry.[10] Respondent did regularize his conduct by submitting a substantive response to the inquiry once ordered to do so by the Board. The substantive response, however, only raises further serious issues concerning Respondent's cooperation.

In his substantive response to Bar Counsel, Respondent made statements to the effect that the invoices from Ms. Fisher–Hammond's medical providers had been reduced by agreement and that the agreed amounts had been paid. He stated these averments as fact:

> Thereafter I spoke to each provider regarding their expenses and arrived at the amount owed. Checks were issued and the file[ ] closed thereafter. I have received no correspondence or calls from the medical providers in her case and believe that they were paid.... At no time did I receive a call from Dr. Launder or Ms. [Fisher–Hammond] in regards to non-payment of any medical bills resulting from treatment in this case.[11]

BX 7 at 2. As noted previously, at the time Respondent made these statements to Bar Counsel, he was aware of (i) Maryland Orthopedics' claim that it had not been paid (through the credit report entries and discussion with his client), (ii) Laurel Regional Hospital's claim that it had not been paid (through the credit report), (iii) a prior negligent misappropriation arising from the lack of any semblance of an accounting system in *Anderson I*, (iv) the similar absence of a written accounting system for these disbursements, (v) the lack of anything in the case file suggesting that the payments had actually been made, and (vi) the lack of any account state-

---

ter of which he has no knowledge.' Because we find the evidence on this score to be something less than clear and convincing, however, we will not rely on this evidence as establishing evasion of service." Hearing Committee Report, p. 40. We share the suspicion, but also do not rely on this matter for our conclusions.

10. In his opposition to Bar Counsel's motion to compel before the Board, Respondent stated that he had "received no notice until now of any disciplinary complaint," BX 10 at 1, when in fact he had corresponded with Bar Counsel concerning the complaint in March 2001 and had discussed the complaint with Ms. Fisher–Hammond in April 2001. In the same pleading, however, Respondent also made the (seemingly contradictory) statement

that he had sought additional time to respond upon becoming aware of the complaint earlier.

11. As noted above, whereas Respondent claimed in his response to Bar Counsel that he had "spoke[n] to each provider" and "arrived at the amount owed," BX 7 at 2, he testified at the hearing that "I remember writing a check to the Hospital, because the Hospital did not get back with me, so I didn't have any choice but to write the $397.12." Tr. 237. Similarly, while Respondent claimed in his statement to Bar Counsel that he had not heard anything from his client regarding an unpaid invoice, he had in fact discussed the unpaid Maryland Orthopedics and Laurel Regional Hospital invoices with Ms. Fisher–Hammond a few months earlier.

ments, cancelled checks, or other bank records documenting the payments. Tr. 323–324. Respondent admits that assurances were given to the client and Bar Counsel without obtaining and reviewing bank records and despite the absence of any records on file. In these circumstances, it was not reasonable for Respondent to make the statements he did without investigation or corroboration, particularly where the acceptance of these assurances would have had the natural tendency to dissuade Bar Counsel from further pursuit of the matter. *See In re Hopkins,* 677 A.2d 55, 60–61 (D.C.1996) ("reasonable" standard for avoidance of serious interference with administration of justice); *In re Wheeler,* Bar Docket No. 372–00 at 25 (BPR May 10, 2004), *dismissed without prejudice,* 871 A.2d 476, 477 (D.C.2005) (per curiam) (dishonesty proven where statements to Bar Counsel "would naturally tend to lead Bar Counsel to believe Respondent was legitimately entitled to some or all of the [misappropriated] $10,000 as legal fees"). We therefore find, based on Respondent's initial non-response to Bar Counsel's inquiry and his subsequent effort to distract that inquiry with unsubstantiated, inaccurate assurances that Respondent has engaged in conduct that seriously interferes with the administration of justice.

## SANCTION

■ Under the doctrine of *In re Addams, supra,* disbarment is required in virtually all cases of reckless or intentional misappropriation. If all of Respondent's conduct here had occurred prior to his 2001 suspension and had resulted exclusively from the record-keeping deficiencies that led the Court to suspend Respondent for six months in *Anderson I,* the Board might have been inclined to suggest a different sanction in this matter. However, recognizing that by the time of the 1996 settlement, Respondent was already aware of the serious problems he had caused in *Anderson I,* and recognizing further that significant misconduct by the Respondent occurred in this matter *after* the Board's recommendation in *Anderson I* and *after* the Court's suspension of Respondent in *Anderson I* in August 2001, the Board sees no alternative but to recommend disbarment in this matter.

Mitigation is not appropriate here. Respondent submitted no evidence in mitigation, and Respondent has had significant previous sanctions for ethical violations. In addition to his suspension in *Anderson I,* and this Board's reprimand in *Anderson II,* Respondent also received an informal admonition from Bar Counsel for neglecting client's case to such a degree that it was dismissed with prejudice by the D.C. Superior Court. *In re Anderson,* Bar Docket No. 334–99 (Bar Counsel, Feb. 27, 2004). Respondent has also been found by the Hearing Committee to be less than candid concerning his violations in this matter. *See In re Cleaver–Bascombe,* 892 A.2d 396, 412 (D.C.2006). In short, under all of the circumstances, the Board recommends Respondent's disbarment.

## RESTITUTION

The Board also adopts the Hearing Committee's recommendation that Respondent should be required, as a condition of reinstatement, to demonstrate restitution for his violation. Respondent concedes that he should pay restitution. Resp. Post–Hrg. Brief 19. The only question is the amount. As of the time of the hearing in this matter, Respondent was in possession of $550.00 ($1,800.00–$1,250.00) belonging to his client from the reduction and settlement of the Maryland Orthopedics invoice; $397.00 from the nonpayment of the Laurel Regional Hospital invoice; $173.00 from the nonpay-

ment of the P.G. Radiodiagnostic invoice; and $24.00 from the reduction of the Capital Emergency Services invoice. Respondent should be prepared to show that he has refunded the sum of these amounts, *i.e.,* $1,144.00, to his client with interest at the District of Columbia statutory rate of 6% from April 31, 1996 until the date of payment. Alternatively, Respondent should be allowed to prove, with corroborating documentation, his satisfaction of any of these obligations in order to reduce the amount required as restitution.

## CONCLUSION

The Board recommends that Respondent be disbarred for his reckless or intentional misappropriation in this matter. The Board further recommends that Respondent be required to show that he has refunded $1,144.00 to his client with interest at the District of Columbia at the legal rate of 6% from April 31, 1996 until the date of payment. Respondent's attention is drawn to the requirements of D.C. Bar R. XI, § 14, and their effect on eligibility for possible reinstatement. *See* D.C. Bar R. XI, § 16(c).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: */IBN/*

All members of the Board concur in this Report and Recommendation except Mr. BAACH, who is recused.